UNITED STATES of America,
Appellee,

v.

Rafael GUZMAN, Defendant–Appellant.

Docket No. 00–1804.

United States Court of Appeals,
Second Circuit.

Argued Sept. 10, 2001.

Decided Feb. 28, 2002.

Edward Zas, The Legal Aid Society, Federal Defender Division—Appeals Bureau, New York, NY, for Defendant–Appellant.

Evan T. Barr, Assistant United States Attorney, New York, NY (Mary Jo White, United States Attorney for the Southern District of New York, on the brief), for Appellee.

Before: KEARSE, MINER, and F.I. PARKER, Circuit Judges.

MINER, Circuit Judge.

Defendant-appellant Rafael Guzman appeals from a judgment of conviction and sentence entered in the United States District Court for the Southern District of New York (Kram, *J.*), convicting him of conspiracy to possess with intent to unlawfully use five or more fraudulently obtained identification documents and sentencing him principally to a term of imprisonment of twenty-four months. In applying the United States Sentencing Guidelines (the "Guidelines"), the district court granted an upward departure in the sentence on the ground that the absence of a loss resulting from the offense did not adequately reflect the seriousness of the offense, and denied a downward ad-

justment for acceptance of responsibility due to Guzman's post-plea conduct. We affirm the denial of a downward adjustment for acceptance of responsibility but vacate the sentence and remand because of error in identifying the proper base offense level in computing the upward departure.

## BACKGROUND

In May of 1997, a confidential informant advised government agents that he could obtain from Guzman New York State drivers' licenses and non-driver identification cards issued by the Department of Motor Vehicles in false names. The informant later introduced a New York City detective, acting in an undercover capacity, to Guzman. The detective sought help in purchasing false identification documents, and, in the spring and summer of 1998, Guzman agreed to process two fraudulent applications for non-driver identification cards in exchange for $800 per card. On each occasion, as directed by Guzman, the detective appeared at the Department of Motor Vehicles office on Worth Street in Manhattan. There, he completed an application for a non-driver identification card, signed and dated a control slip, and was photographed. He did not present these materials to a window clerk at the Department office but rather delivered them to Guzman's apartment in the Bronx. After each delivery, the transactions were processed by a window clerk at the Worth Street office, and a non-driver identification card with the false name and date of birth furnished by the undercover detective was issued. When Guzman was arrested on September 16, 1998 at his apartment, agents recovered numerous documents pertaining to the scheme, including interim identification cards, final non-driver identification cards, blank Department of Motor Vehicle application forms, counterfeit social security cards, and birth certificates. Also recovered were one death certificate, two foreign passports, and $4,344 in cash.

In post-arrest statements, Guzman admitted that he had trafficked in fraudulent Department of Motor Vehicles documents since 1995. He revealed that he had acted as a "broker" on behalf of people (usually illegal aliens) who sought false identification cards. He said that he was connected to some corrupt Department employees who would process the documents. Guzman charged each person approximately $800 in cash for each phony document, retaining between $50 and $200, and remitting the balance to the other participants in the scheme. He also referred some of his customers to another "broker" connected to corrupt employees. Guzman identified a number of other participants in the scheme and agreed to introduce an undercover detective to the owner of a driving school who was selling fraudulent drivers' education course completion certificates.

Guzman entered into a written Cooperation Agreement with the government in December of 1998. According to the Cooperation Agreement, Guzman was to provide complete and truthful information to the authorities and to commit no further crimes. Any assistance provided by Guzman was to be pursuant to the instructions and control of the authorities. The Government agreed to file a motion for a downward adjustment pursuant to Section 5K1.1 of the Guidelines if it "determine[d] that GUZMAN ha[d] provided substantial assistance in an investigation or prosecution, and if he ha[d] fully complied with the understandings specified in this Agreement." On February 17, 1999, pursuant to the Cooperation Agreement, Guzman pleaded guilty in the district court to a

one-count Information charging him with conspiracy to

possess with intent to use unlawfully, and transfer unlawfully, five and more identification documents (other than those issued lawfully for the use of the possessor) and false identification documents, which were transported in the mail, to wit, fraudulently obtained New York State Non–Driver Identification cards and New York State Drivers' Licenses, in violation of Title 18, United States Code, Section 1028(a)(3).

In April of 1999, a New York City detective saw Guzman in the parking lot of a Department of Motor Vehicles office in the Bronx. Thereafter, Guzman was instructed not to go anywhere near a Department office without explicit authorization from his case agents. Despite this instruction, Guzman was seen visiting in the vicinity of the Worth Street office on at least three occasions. None of these visits was authorized. On the first two occasions, a detective observed Guzman speaking with groups of individuals while handling papers appearing to be application forms. On the third occasion, he was seen by a Worth Street office supervisor, who reported this observation to a detective involved in the conspiracy investigation. The detective and a United States probation officer went to the Worth Street office, where they found Guzman outside the building conversing with two people and gesturing toward a number of application forms in his hand. The detective confiscated the forms and instructed Guzman to leave. The government thereafter terminated the Cooperation Agreement.

The pre-sentence investigation report prepared in anticipation of Guzman's sentencing indicated an offense level of six-teen under the Guidelines, computed as follows: A base offense level of six for the offense of conviction, pursuant to Section 2F1.1(a); an eight-level increase based on the amount of loss, pursuant to Section 2F1.1(b)(1)(I); and a two-level increase because the offense involved more than minimal planning, pursuant to Section 2F1.1(b)(2). U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 2F1.1 (1998).[1] The probation office recommended against any reduction for acceptance of responsibility because Guzman continued to engage in criminal conduct after pleading guilty. With one criminal history point based on a prior conviction for conspiracy to defraud the Postal Service and a consequent criminal history category of I, the sentencing range calculated by the probation office was imprisonment for twenty-one to twenty-seven months. The recommendation was for imprisonment for twenty-seven months.

Guzman objected to the calculation of his sentence in two respects. He first claimed that he should receive a three-level reduction for acceptance of responsibility pursuant to Section 3E1.1(b) because he had timely pleaded guilty, attempted to cooperate with the government, and engaged in no further criminal conduct after his plea. With regard to his post-plea conduct, he argued that his visits to the offices of the Department of Motor Vehicles were consistent with innocent behavior, and he asserted that, on one occasion, working as a gypsy cabdriver, he drove a passenger to a Motor Vehicles office. While parked outside the office, he says he was approached by people he knew through his past dealings in identification cards but merely spoke to them without engaging in any criminal activity.

---

1. The 1998 Guidelines were used to calculate Guzman's sentence and neither party challenges their applicability.

As to his second claim, Guzman argued against the eight-level increase for the amount of loss, contending that there was no actual loss to those who participated in the fraud, nor to the State, which received the actual fees required for the issuance of the identification documents. The government ultimately conceded that Guzman's offense had not resulted in intended or actual loss to any identifiable victim and that the eight-level enhancement therefore was not warranted. Because the total offense level without the enhancement would only have been eight (assuming no downward adjustment for acceptance of responsibility), with a consequent sentencing range of zero to six months, the government requested an upward departure. This request was grounded in the government's contention that the lack of loss in this case did not reflect adequately the seriousness of Guzman's conduct. The government urged the district court to refer to an analogous guideline applicable to bribery offenses.

Guzman appeared before the district court for sentencing on December 13, 2000. The court first addressed the issue of acceptance of responsibility as follows:

> I am going to indicate that any evidence of acceptance of responsibility is outweighed by Mr. Guzman's post-plea conduct, because it is inconsistent with such acceptance of responsibility. I understand that I have the authority to downward depart. However, I find such a departure is not warranted.

The court then addressed the government's request for upward departure as follows:

> I find that the zero loss amount does not adequately address the seriousness of Mr. Guzman's offense and that an upward departure of 7 levels is therefore warranted. I have based the extent of the upward departure on the sentence for bribery, which I find to be an analogous guideline.

According to the judgment of conviction and sentence entered in the district court on January 11, 2001, the Guidelines range determined by the court was based on a total offense level of fifteen and a criminal history category of I. The imprisonment range, according to the court's determination, was eighteen to twenty-nine months,[2] the supervised release range was two to three years, and the fine range was $4,000 to $40,000. The actual sentence imposed by the court was imprisonment for twenty-four months, a supervised release period of three years, a fine of $1,000, and a special assessment of $100. This appeal of the sentence followed.

## DISCUSSION

### I. *The Upward Departure*

Application Note 12 to Section 2F1.1 of the Guidelines applied at Guzman's sentencing provided the authority for discretionary upward departures in cases involving false identification documents. It stated, in pertinent part: "In the case of an offense involving false identification documents or access devices, an upward departure may be warranted where the actual loss does not adequately reflect the seriousness of the conduct."[3] According-

---

2. The correct sentencing range is eighteen to twenty-four months. U.S.S.G., ch. 5, pt. A.

3. Section 2F1.1 was deleted, effective November 1, 2001. It was replaced by Section 2B1.1, which includes an Application Note allowing for upward departures in sentencing where "the offense level determined under this guideline [which pertains to various offenses, including those pertaining to false identification documents] substantially understates the seriousness of the offense." U.S.S.G. § 2B1.1, Application Note 15(A). A "non-exhaustive" listing of factors for determining when an upward departure is warranted is included in the new guideline.

ly, the district court was justified in determining that an upward departure would be appropriate in Guzman's case, where the loss amount of zero did not adequately reflect the seriousness of his conduct in acting as a broker for the issuance of false identification documents by corrupt employees of the Department of Motor Vehicles. *See United States v. Robie*, 166 F.3d 444, 455–56 (2d Cir.1999) (noting that sentencing court on remand may upwardly depart because the lack of a loss did not fully capture the seriousness of the offense); *United States v. Puello*, 21 F.3d 7, 10 (2d Cir.1994) (affirming upward departure because the loss amount was zero for purposes of the fraud guideline).

 We review a district court's decision to depart from the Guidelines for abuse of direction. *United States v. Adelman*, 168 F.3d 84, 87 (2d Cir.1999). In doing so, we apply a three-part test:

First, we determine whether the reasons articulated by the district court for the departure are of a kind or a degree that may be appropriately relied upon to justify the departure. Second, we examine whether the findings of fact supporting the district court's reasoning are clearly erroneous. Finally, we review the departure for reasonableness, giving considerable deference to the district court.

*United States v. Khalil*, 214 F.3d 111, 124 (2d Cir.2000) (citations and internal quotation marks omitted); *see also United States v. Karro*, 257 F.3d 112, 120 (2d Cir.2001); *United States v. Napoli*, 54 F.3d 63, 66 (2d Cir.1995). We have explained our review for reasonableness as follows:

In determining whether the extent of the departure is reasonable, the court should look "to the amount and extent of the departure in light of the grounds for departing" and "examine the factors to be considered in imposing a sentence under the Guidelines, as well as the district court's stated reasons for the imposition of the particular sentence." The key question is whether the "reasons given by the district court ... are sufficient to justify the magnitude of the departure."

*United States v. Campbell*, 967 F.2d 20, 26 (2d Cir.1992) (*quoting Williams v. United States*, 503 U.S. 193, 204, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992)).

 In examining the reasonableness of an upward departure, we may look to analogous statutes and their guidelines for guidance. *See Puello*, 21 F.3d at 10. Indeed, we have said that "[r]eference to an analogous statute is a well-established method to determine the magnitude of an upward departure." *United States v. Fan*, 36 F.3d 240, 245 (2d Cir.1994). Accordingly, it was proper for the district court to seek out an analogous statute for upward departure in the case of Guzman, where the loss amount of zero did not capture the seriousness of the offense for sentencing purposes.

Guzman does not contend on appeal that the district court erroneously concluded that a loss amount of zero did not adequately reflect the seriousness of his conduct in acting as a broker for false identification documents. He does not even question the application of the bribery statute and its relevant guidelines for an analogy in determining an appropriate upward departure. What he does challenge is the methodology employed by the district court in the overall computation of his Guidelines level, and we think that the challenge is well grounded.

 It seems to us that, before considering any upward departure for failure of the offense of conviction to reflect the seriousness of the offense, the district court must start out with the base offense level

of the offense of conviction. Here, the district court began its computation with a base offense level of ten, the offense level for the uncharged federal offense of bribery, rather than a base offense level of six, the level prescribed for the offense of conviction. The district court added a two-level adjustment for more than one bribe and a three-level adjustment for the $16,500 profit attributed to Guzman for his "brokerage" payoffs. This computation provided for a total offense level of fifteen, carrying an imprisonment range of eighteen to twenty-four months. The district court sentenced Guzman to a prison term of twenty-four months—the highest end of the sentencing range.

Although the district court did not spread upon the record a detailed computation of the total offense level, it did note that an upward departure of seven levels was warranted because "the zero loss amount did not adequately address the seriousness of Mr. Guzman's offense." The district court specifically stated that it "based the extent of the upward departure on the sentence for bribery." The seven-level departure that results in an offense level of fifteen apparently refers to the increase over the offense level of eight that would have prevailed if the court had computed a Guidelines range based solely on the fraud guideline applicable to the offense of conspiracy to procure false identification documents (a base offense level of six, plus two levels for more than minimal planning).

The district court adopted the government's argument at sentencing that the bribery guideline should be applied in toto. Shortly before the court's brief statement regarding departure, the Assistant United States Attorney stated:

> Under [the bribery] guideline, which is section 2C1.1, your Honor, the numbers work out, as your Honor is aware,

with a base offense level of 10 plus 2 points for more than one bribe, plus I believe an additional 3 points for the amount of profits which Mr. Guzman himself has acknowledged that he retained, which is somewhere in the ballpark of $16,000, the amount that actually was residual to him. You end up with an offense level 15.

> We are suggesting that your Honor depart upwardly by the amount if [sic] of I believe it is 7 levels, which is the difference between what the guidelines would work out to without any loss under section 2F1 and how the guidelines work out under this analogous guideline.

By stating that "an upward departure of 7 levels is . . . warranted," the district court approved the computation methodology advanced by the government. Arguing on appeal in favor of that methodology, the government asserts that the court "did not act unreasonably in concluding that an upward departure of seven levels—the amount required to approximate the punishment Guzman would have faced had he been prosecuted for bribery—was required to adequately address the seriousness of Guzman's crimes." We disagree and adopt the methodology described in *Puello*, 21 F.3d 7.

In *Puello*, the defendant pleaded guilty to illegally redeeming food stamp coupons. The fraud guideline, Section 2F1.1, as in the case at bar, was the applicable guideline. The district court found that the fraud guideline did not adequately account for the seriousness of the offense of conviction and departed upward in sentencing, using the crime of money laundering as an analogous offense and applying its guideline, Section 2S1.1. *Id.* at 9. In calculating the departure, the district court assigned a base offense level of six in accordance with Section 2F1.1 and then added an eleven-level adjustment pursuant to Section

2S1.1(b)(2)(L) referable to the amount involved under the money laundering guidelines. In summarizing our opinion affirming the sentence, we stated: "The court did not abuse its discretion in departing upward from the base offense level for fraud. The court did not err in referring to the money laundering guideline in determining the degree of the departure." *Id.* at 11.

Although the government is correct in its contention that *Puello* does not specifically require the use of the methodology employed by the district court in that case, we think that the methodology is the proper one to be followed in all cases where analogous guideline sentencing is employed. The sentencing court should first apply the base offense level and the sentencing characteristics for the offense of conviction and *then*, in the exercise of its discretion, apply an analogous guideline it deems appropriate for an upward departure. We think that an upward departure means a departure starting from the guideline provided for the offense of conviction, whether the departure is based on an analogous guideline provision or on any other rationale.

II. *The Denial of a Downward Adjustment for Acceptance of Responsibility*

Although Guzman concedes that his post-plea visits to the Department of Motor Vehicle offices violated his Cooperation Agreement, he contends that he is nonetheless entitled to a downward adjustment for acceptance of responsibility. He notes that the district court made no finding that he had a criminal purpose or that he lied about the visits or tried to conceal them. He does note that he entered a timely guilty plea and otherwise demonstrated his acceptance of responsibility.

█ Under the Guidelines, a defendant qualifies for a downward adjustment

"[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). The Guidelines also recognize that "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility" such that "the determination of the sentencing judge is entitled to great deference on review." *Id.* § 3E1.1, Application Note 5. Thus, we will not disturb the district court's factual determination regarding whether a defendant has accepted responsibility unless it is "without foundation." *United States v. Austin,* 17 F.3d 27, 30 (2d Cir.1994); *United States v. Fredette,* 15 F.3d 272, 277 (2d Cir.1994). While entry of a guilty plea is "significant evidence" of acceptance of responsibility, "this evidence may be outweighed by conduct ... that is inconsistent with ... acceptance of responsibility." U.S.S.G. § 3E1.1, Application Note 3.

█ In this case it cannot be said that the district court's factual determination with regard to the question of acceptance of responsibility is without foundation. The district court concluded that the downward adjustment sought was not warranted because "any evidence of acceptance of responsibility is outweighed by Mr. Guzman's post-plea conduct, because it is inconsistent with such acceptance of responsibility." This conclusion finds adequate support in the record. In April of 1999, two months after his plea, Guzman was seen in the parking lot of a Motor Vehicles Department office in the Bronx by an undercover detective. Following the incident, he was given explicit instructions to stay away from any such office without express authorization from government agents. He subsequently was observed by detectives in the vicinity of the Worth Street office in Manhattan on at least three occasions. During two of those occasions, he was seen conversing with groups

of people while holding what apparently were application forms. Guzman was not authorized by government agents to be present on any of those occasions.

Guzman claims that his presence at a Motor Vehicles Department office on one of the occasions was due to the fact that, during his employment as a livery driver, he was asked to drive a passenger to the office. He says he spoke with various people there who knew him from his criminal past in order to avoid revealing that he was cooperating with the government. However, he did not explain why he was present at the office on the other occasions, including a visit after his Cooperation Agreement had been terminated for just that sort of conduct.

Given the record of Guzman's post-plea conduct, the district court was justified in determining that he had not sincerely accepted responsibility for his offense. *See United States v. Harris*, 13 F.3d 555, 557 (2d Cir.1994); *United States v. Woods*, 927 F.2d 735, 735–36 (2d Cir.1991) (per curiam). The strong inference to be drawn from Guzman's post-plea visits to Motor Vehicles Department offices is that he was continuing to engage in the very criminal activity that led to the charges against him and to his guilty plea to those charges. The only conclusion to be drawn from such post-plea conduct is that it is "inconsistent with a full and ungrudging acceptance of responsibility." *United States v. Saxena*, 229 F.3d 1, 10 (1st Cir.2000).

## CONCLUSION

The sentence portion of the judgment of the district court is vacated, and the case is remanded for further proceedings consistent with the foregoing.