19-436(L)
United States v. Huberfeld

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2019

(Argued: February 4, 2020)                  Decided: August 4, 2020)

Docket No. 19-436 (L)

_____

UNITED STATES OF AMERICA,

*Appellee*,

v.

NORMAN SEABROOK, MURRAY
HUBERFELD,

*Defendants-Appellants*.

_____

Before: POOLER, LYNCH, and MENASHI, *Circuit Judges*.

Appeal from United States District Court for the Southern District of New

York (Alvin K. Hellerstein, *J.*), convicting Murray Huberfeld, after a guilty plea,

of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371. We hold that

the district court erred at sentencing by applying the commercial bribery sentencing guideline based on an uncharged bribery scheme that the government dropped in exchange for Huberfeld pleading guilty to the wire fraud. Vacatur is warranted because we cannot be confident, despite the district court's statement to the contrary, that it would have imposed the same sentence had it instead used the correct guideline.

We also hold that the district court erred by ordering $19 million in restitution to be paid to the Corrections Officers Benevolent Association ("COBA"), an entity that was not a victim of the convicted conduct under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A.

Accordingly, we vacate and remand for Huberfeld's resentencing and reverse the restitution order. We decide Norman Seabrook's appeal through summary order, which we issue simultaneously with this opinion.

Vacated and remanded in part; and reversed in part.

_____

KANNON K. SHANMUGAM, Paul, Weiss, Rifkind, Wharton & Garrison LLP (Masha G. Hansford, Katherine S. Stewart, Amanda C. Weingarten, *on the brief*), Washington DC, *for Defendant-Appellant Huberfeld*.

2

RICHARD W. LEVITT, Levitt & Kaizer, New York, NY, *for Defendant-Appellant Norman Seabrook*

MARTIN S. BELL, Assistant United States Attorney (Russell Capone, Lara Pomerantz, Won S. Shin, Assistant United States Attorneys, *on the brief*), *for* Audrey Strauss, Acting United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

POOLER, *Circuit Judge*:

Appeal from United States District Court for the Southern District of New York (Alvin K. Hellerstein, *J.*), convicting Murray Huberfeld, after a guilty plea, of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371. We hold that the district court erred at sentencing by applying the commercial bribery sentencing guideline based on an uncharged bribery scheme that the government dropped in exchange for Huberfeld pleading guilty to the wire fraud. Vacatur is warranted because we cannot be confident, despite the district court's statement to the contrary, that it would have imposed the same sentence had it instead used the correct guideline.

We also hold that the district court erred by ordering $19 million in restitution to be paid to the Corrections Officers Benevolent Association

3

("COBA"), an entity that was not a victim of the convicted conduct under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A.

Accordingly, we vacate and remand for Huberfeld's resentencing and reverse the restitution order. We decide Norman Seabrook's appeal through summary order, which we issue simultaneously with this opinion.

## BACKGROUND

### I.    Factual Background

In the early 2000s, Huberfeld co-founded the Manhattan-based hedge fund, Platinum Partners. By 2011, Huberfeld had stepped down from a management role at Platinum and assumed a legacy role as limited partner. His primary responsibility in that role was to solicit investors and refer potential clients to the then-current management team.

Defendant Norman Seabrook was the long-time president of COBA, New York City's largest union for corrections officers. He wielded immense influence over the union's operations. His control of COBA extended to its finances, including the administration of its Annuity Fund, a retirement benefits program for corrections officers with holdings of more than $70 million.

4

In late 2013, Platinum experienced significant levels of redemptions from its investors. Huberfeld understood that this meant Platinum needed to find new clients. Around this time, he told Jona Rechnitz, a real-estate businessman and mutual acquaintance of Seabrook and Huberfeld, that Platinum was looking to attract institutional investors such as unions. Rechnitz, who had spent time cultivating relationships in law enforcement leadership circles, suggested that he might be able to recruit COBA as a client by courting Seabrook.

Rechnitz invited Seabrook on a vacation to the Dominican Republic where Rechnitz proposed investing COBA's money into Platinum. Seabrook agreed, but he wanted to get paid for it. When Rechnitz relayed this to Huberfeld, he was amenable to the arrangement. Huberfeld devised a formula whereby Platinum would pay Seabrook a portion of the profits from COBA's investment, estimating an annual payment between $100,000 and $150,000.

Seabrook immediately took steps to ensure COBA would invest in Platinum. At first, he went through the motions of having Platinum make a pitch to COBA's Annuity Fund board. The board directed its financial advisors and attorneys to conduct due diligence, and authorized Seabrook to invest up to $10 million if the advisors concluded that the investment was prudent. When some

5

of the attorneys expressed concern, however, Seabrook concealed those warnings from the board. In March 2014, COBA invested $10 million from its Annuity Fund in a Platinum fund. After the initial investment, COBA made two additional $5 million investments.

At the end of 2014, when it came time to make the first payment to Seabrook, Huberfeld told Rechnitz that the fund had underperformed, and Seabrook would only get $60,000. Rechnitz agreed to personally pay out the cash to Seabrook, and Huberfeld agreed that Platinum would reimburse him for it. Before meeting Seabrook, Rechnitz stopped at Salvatore Ferragamo on Fifth Avenue in Manhattan and bought an expensive handbag. He stuffed the $60,000 of cash inside and handed it to Seabrook, who was parked in his car a few blocks away. In order to paper over the reimbursement, Rechnitz, through his company, invoiced Platinum for courtside tickets to eight New York Knicks games. Rechnitz forwarded the invoice by email to Huberfeld. Three days later, Platinum sent a check to Rechnitz for $60,000, ostensibly to cover the cost of the Knicks tickets.

In 2015, Huberfeld, through another mutual associate, continued to lobby Seabrook for investments. But, after a former COBA board member filed a

6

lawsuit against the union that mentioned the Platinum investments, and after the government's investigation of Seabrook became known, COBA made no additional investments.

In June 2016, the FBI arrested Rechnitz, Seabrook, and Huberfeld. Federal agents also executed a search warrant at Seabrook's home. They recovered, among other things, over $20,000 in cash and the Salvatore Ferragamo bag. Six months later and two years after COBA's initial investment, Platinum filed for bankruptcy and COBA lost $19 million of its $20 million investment.

## II.     Procedural History

On July 7, 2016, a federal grand jury sitting in the United States District Court for the Southern District of New York returned an indictment charging Seabrook and Huberfeld with honest services wire fraud and conspiracy to commit honest services wire fraud. The indictment alleged a commercial bribery scheme that "deprive[d] members of COBA of their intangible right to the honest services of SEABROOK, its President. . . ." App'x at 18. In late October 2017, Seabrook and Huberfeld were tried jointly before the Hon. Andrew L. Carter, Jr.[1]

---

[1] On March 15, 2017, Rechnitz pled guilty to one count of conspiracy to commit honest services wire fraud through a separate charging instrument. He later

7

That trial ended in a hung jury. For administrative reasons, the matter was reassigned to the Hon. Alvin K. Hellerstein.

Following the mistrial, the government approached Huberfeld with a plea offer. Huberfeld agreed to plead guilty to a superseding information that charged him only with conspiracy to commit wire fraud for presenting the false $60,000 invoice to Platinum, instead of the overarching bribery scheme that was charged in the superseding indictment. The only reference to COBA in the information was the allegation that Huberfeld and Rechnitz knew that "the actual purpose of the payment [of $60,000] was to reimburse Rechnitz for having paid Norman Seabrook . . . for Seabrook's efforts to get COBA to invest millions of dollars in Platinum." App'x at 42.

In the plea agreement, the parties stipulated that the applicable sentencing guideline was U.S.S.G § 2B1.1, the fraud guideline. After a two-level reduction for Huberfeld's acceptance of responsibility, the parties stipulated that, based on a $60,000 loss, the final offense level was 10, resulting in a Guidelines range of 6 to 12 months' imprisonment.

---

played a prominent role in the prosecution's case against Huberfeld and Seabrook.

On May 25, 2018, the parties appeared before the district court for a plea hearing. The government explained that the scheme involved Huberfeld "defrauding Platinum Partners out of this $60,000 that was used to pay Mr. Seabrook" and that the payment's purpose was "to cover the cost of compensating Mr. Seabrook for his efforts in securing the union's investment in the hedge fund." App'x at 68, 69. Initially, the district court expressed "reservations" about accepting the plea because the superseding information did not charge the overarching bribery scheme. App'x at 73. The district court discussed the false invoice as a "constituent part of a larger fraud," and stated that Huberfeld was "an agent in paying a bribe in order to procure an investment." App'x at 70. The government disagreed with this characterization, at least as it related to the contents of the charging instrument:

> [THE GOVERNMENT]: But to be clear, your Honor, the superseding information doesn't charge the broader scheme. It charges --
>
> THE COURT: That's my trouble, Mr. Bell. That's exactly my trouble.
>
> [THE GOVERNMENT]: I'm not sure I understand, your Honor.
>
> THE COURT: He's pleading guilty to the information. But to understand the plea of guilty, you have to go into a larger picture and that was the purpose of it.
>
> [THE GOVERNMENT]: But I respectfully, your Honor --

9

THE COURT: You allege as the purpose of the conspiracy in paragraph two the to wit phrase on the top of page two.

[THE GOVERNMENT]: Yes, your Honor.

THE COURT: That Huberfeld and Rechnitz caused Platinum Partners to pay $60,000 to Rechnitz through a false representation to which Mr. Huberfeld was aware. When, in fact, the actual purpose of the payment was to reimburse Rechnitz for having paid Seabrook for Seabrook's efforts to get the pension plans that he controlled to invest money in Platinum. That's the overall picture.

[THE GOVERNMENT]: That's correct, your Honor. I think what I'm noting for these purposes --

THE COURT: The fraud is not a $60,000 fraud.

[THE GOVERNMENT]: Well, the fraud charged, your Honor, is a $60,000 fraud.

THE COURT: Exactly.

[THE GOVERNMENT]: Because the fraud charged is defrauding Platinum.

THE COURT: But the description of the fraud is not alleged as a $60,000 fraud. It doesn't specify the amount of the fraud. The information clearly alleges the purpose of the information, but the guidelines calculations differ, because it talks about a $60,000 loss.

[THE GOVERNMENT]: Well, perhaps, your Honor, the most helpful way to do this would be to break it down as follows. The information alleges a particular fraud with a particular victim. The victim of the fraud conduct alleged in the superseding information S2 is the Platinum Partners hedge fund.

With respect to the degree, with respect to the extent of that fraud, we

have stipulated and the facts support that they were defrauded to the tune of the $60,000 that they got on false pretenses as a result of the conspiracy between Mr. Huberfeld and Mr. Rechnitz. That is the fraud alleged in the superseding information. And that is the fraud for which there is an identifiable victim within the instrument. That's Platinum Partners. They were defrauded to the tune of $60,000.

THE COURT: It's hard to think that Platinum Partners was a victim.

[THE GOVERNMENT]: Well, respectfully, your Honor, as a legal matter, they are . . . .

App'x at 71-73.

Notwithstanding its concerns, the district court accepted Huberfeld's guilty plea.

In early August 2018, Seabrook was retried—this time as the only defendant. Two weeks later, the jury returned guilty verdicts on both the conspiracy and substantive counts of honest services wire fraud.

On October 30, 2018, in advance of Huberfeld's sentencing, the district court issued an order directing the parties to discuss, in relevant part, whether the court had discretion to consider COBA's loss; how much of that loss should Huberfeld have reasonably foreseen given Platinum's financial condition at the time of the fraud; and whether the court could order restitution to COBA as a

11

victim.[2] Huberfeld disputed that the loss of $19 million was foreseeable to him at the time of COBA's investment and attached expert reports that took the same position. He also requested an evidentiary hearing in the event that the district court was considering the $19 million loss to COBA with respect to either his sentencing or restitution.

In late 2018, the Probation Office prepared Huberfeld's presentence report. As did the plea agreement, the Probation Office calculated a Guidelines range of 6 to 12 months' imprisonment. However, Probation recommended an upwards variance to 24 months' imprisonment in part because the Guidelines range did not adequately take into account the full scope of the overall scheme.

In February 2019, Huberfeld appeared for his sentencing.[3] At the outset, the district court made it clear that it was not satisfied using the agreed-upon

---

[2] Following the issuance of that order, COBA filed a motion requesting restitution. Huberfeld thereafter entered into an agreement with COBA to pay it $7 million. COBA acknowledged that this payment "fully and completely compensate[d] and satisf[ied] COBA with respect to Huberfeld," and it formally withdrew its restitution motion. App'x at 88-89. The parties agreed that the district court could take into account this voluntary redress.

[3] One week earlier, the district court sentenced Seabrook to 58 months' imprisonment and $19 million in restitution to COBA, owed jointly and severally with Huberfeld and Rechnitz, neither of whom had yet been sentenced.

fraud guideline to calculate the sentencing range. The district court insisted that

"[s]omehow, in some way, we must take into consideration the purpose of the

papering of the Platinum Partners file." App'x at 105.

Both parties asserted that the district court could not rely on the uncharged

conduct in determining the appropriate offense guideline section. The district

court disagreed:

> As I indicated at the allocution of the plea and now, I think that [the fraud] guideline is inadequate. The gravamen of this offense and why it is so pungent is the bribery of a union leader to invest a substantial amount of pension money and expense money in a risky investment, an investment which told the investor that the investment is speculative and the offering involves substantial risks of loss as described in the document.

App'x at 112.

The district court then concluded that, although it was permitted to take

account of COBA's $19 million loss as "relevant conduct" under Section 1B1.3,

the fraud guideline still was inadequate because when the $19 million loss was

applied to the fraud guideline, it yielded a sentencing range that was

"excessive."[4] Instead, the district court decided to use U.S.S.G. § 2B4.1, the

---

[4] As the district court explained, applying the fraud guideline to a $19 million loss resulted in a sentencing range of 51 to 63 months' imprisonment.

commercial bribery guideline. As it explained:

> That [fraud guideline range] comes out to my mind excessive. But it is something that must stick in one's mind. The purpose of this investment by someone who had to know better and had already been involved in frauds was to bribe someone to get money, to put a stumbling block, as it were, before a blind man and to blind the eyes of wise men and pervert the words of the righteous, which is what a bribe does.

> I urge that this is inappropriate because it is commercial bribery and really I should look at a different guideline, a guideline specifically tailored for commercial bribery.

App'x at 115.

In order to apply the commercial bribery guideline, the district court invoked one of the fraud guideline's "cross references," U.S.S.G. § 2B1.1(c)(3), which allows the court to use another guideline if that offense's conduct is alleged in the indictment or information. Presumably reasoning that the superseding information alleged the bribery conduct, the court cross referenced the commercial bribery guideline. It started with a base level of 8 and added "the fees that would be generated by a \$20 million investment" as the value of the improper benefit conferred on Huberfeld by the bribe. *Id.* The district court explained that:

> Hedge funds . . . operate on a 2 percent and 20 percent formula: 2

14

percent each year of total money invested and 20 percent of gain as figured by the accountants of the hedge fund, counting not only market gain but also gain that has a book value nature because the investments are considered more valuable. Let's look only at the 2 percent. 2 percent times let's say 1 year of investment comes to $400,000 of additional fees.

App'x at 115-16.

The district court referred to the benefits table in the Guidelines and determined that it should add 14 levels based on the $400,000 amount, leading to what the district court mistakenly calculated as a range of 30 to 37 months' imprisonment.[5]

The district court ultimately sentenced Huberfeld to 30 months' imprisonment. It stated that it would have arrived at the same sentence irrespective of whether it used the fraud guideline or the commercial bribery guideline: "Whether I start with a 12-month guideline and vary upwards from it or whether I use the guideline calculation that led to 30 to 37 months of a guideline, I sentence Mr. Huberfeld to 30 months in custody." App'x at 151.

At the end of the hearing, the district court addressed restitution. The court took the view that COBA was a victim of the charged wire-fraud offense

---

[5] As discussed below, the district court evidently misread the benefits table.

15

because reimbursing Rechnitz for the bribe was the purpose of the wire fraud and the bribe was a "mechanism" for "profit[ing] from th[e] crime." App'x at 154. It ordered Huberfeld to pay restitution to COBA in the amount of $19 million, jointly and severally with Seabrook and Rechnitz.

This appeal followed.

## DISCUSSION

Huberfeld argues that the district court erred by (1) applying the sentencing guideline for commercial bribery based on the uncharged bribery scheme—and by misapplying that guideline on its own terms; (2) imposing a substantively unreasonable sentence; and (3) ordering $19 million in restitution to COBA, an entity that was not a victim of the convicted wire-fraud offense. He also argues that the matter should be reassigned to another district court judge. We address each of these arguments in turn.

## I. Reasonableness of Sentence

We review a sentence on appeal for procedural and substantive reasonableness. *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). A district court commits procedural error when, among other ways, it makes a mistake in

16

its Guidelines calculation. *Id.* at 190. "Where we find significant procedural error, one proper course would be to remand to the district court so that it can either explain what it was trying to do, or correct its mistake and exercise its discretion anew." *Id.*

### A. Procedural Error

Huberfeld argues that the district court erred by calculating his Guidelines range under the commercial bribery guideline because he was not charged with bribery and the superseding information did not allege the elements of any commercial bribery charge. The government concedes that the court used the wrong guideline but argues that the error was harmless because the district court stated that it would have imposed the same sentence under either guideline. We agree with Huberfeld that we cannot be confident that the district court would have imposed the same sentence if it had applied the correct guideline.

"A district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range." *Cavera*, 550 F.3d at 189. In light of "[t]he Guidelines' central role in sentencing," an error related to the Guidelines range "can be particularly serious." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345 (2016). "A district

17

court that improperly calculates a defendant's Guidelines range . . . has committed a significant procedural error." *Id.* at 1345-46 (internal quotation marks, brackets, and citation omitted).

The district court was obligated to use the fraud guideline as "the offense guideline section . . . applicable to the offense of conviction." U.S.S.G. § 1B1.2(a).[6] The parties stipulated to using the fraud guideline in their written plea agreement. The Probation Office also determined that the fraud guideline was the correct one, and that it yielded a sentencing range of 6 to 12 months' imprisonment.

Although the district court is free to cast aside the stipulations in the plea agreement and recommendations in the Presentence Report, it cannot ignore our direction on how to apply the Guidelines. Under our precedent, it was improper for the court to cross reference the commercial bribery guideline. The cross reference provision permits a district court to use a different guideline only when

---

[6] A sentencing court must "[d]etermine the offense guideline section . . . applicable to the offense of conviction." U.S.S.G. § 1B1.2(a). The offense of conviction here was conspiracy to commit wire fraud, 18 U.S.C. § 371, and the substantive offense was wire fraud, 18 U.S.C. § 1343. Wire fraud is governed by Section 2B1.1, *see* U.S.S.G. § 2B1.1 cmt.; U.S.S.G. App. A at 565.

"the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline[]." U.S.S.G. § 2B1.1(c)(3). Use of the cross reference is limited to circumstances where the conduct set forth in the convicted count of the charging document "actually constitutes an offense covered by another guideline." *United States v. Genao*, 343 F.3d 578, 584 (2d Cir. 2003). In other words, for the cross reference to be available here to allow the district court to apply the commercial bribery guideline, there must have been conduct set forth in the superseding information alleging that Huberfeld committed a commercial bribery offense.

But the count of conviction in the superseding information does not establish the elements of any commercial bribery offense. As the government itself underscored during the plea colloquy, "the superseding information doesn't charge the broader [bribery] scheme." App'x at 71. The information does not allege that Huberfeld acted with corrupt intent or that he solicited or made payment in exchange for a benefit, as is generally required by the commercial bribery statutes. *See*, *e.g.,* 18 U.S.C. § 215; *see also United States v. McElroy*, 910 F.2d 1016, 1021 (2d Cir. 1990) ("The term 'corruptly' is ordinarily understood as referring to acts done voluntarily and intentionally and with the bad purpose of

19

accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means.") (internal quotations, brackets, and citation omitted). Rather, the information alleges only that the purpose of the $60,000 payment was not the stated purpose of purchasing Knicks tickets—a detail that the government noted was "just a description." App'x at 107. Accordingly, because the count of conviction in the superseding information does not allege conduct that establishes the elements of any commercial bribery offense, the district court was not permitted to invoke the cross reference to apply the commercial bribery guideline.

Of course, after determining the correct guidelines range, the district court may vary from that range and may look elsewhere, including to other sentencing guidelines provisions, to set a benchmark for how much to vary upwards or downwards. *See Kimbrough v. United States*, 552 U.S. 85, 110 (2007); *see also Spears v. United States*, 555 U.S. 261, 266 (2009); *Cavera*, 550 F.3d at 196. But the district court erred after it applied the commercial bribery guideline. In order to calculate the Guidelines range under the commercial bribery guideline, the district court was required to identify the value of the "improper benefit to be conferred," and to use that value to calculate the range. *See* U.S.S.G. § 2B4.1(b)(1). In identifying

20

the value of the benefit, the district court seemed to arrive at its $400,000 figure by estimating the fees earned by management at a hypothetical hedge fund, using a formula which was not part of the parties' sentencing submissions or the presentence report. Even assuming arguendo that the court's method of determining that figure was appropriate, a proposition of which we are dubious, it plainly made a mistake in deriving the offense level from that figure. A 14-level increase in the offense level is warranted only when the benefit conferred is greater than $550,000 (but less than $1,500,000); a $400,000 benefit conferred supports an increase of only 12 levels. *See* U.S.S.G. §§ 2B1.1(b)(1)(G)-(H), 2B4.1(b)(1). That error elevated Huberfeld's sentencing range from 24 to 30 months (based on an offense level of 17) to 30 to 37 months (based on an offense level of 19).

We note that the district court cannot insulate its sentence from our review by commenting that the Guidelines range made no difference to its determination when the record indicates that it did. The Guidelines, although advisory, are not a "body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). We have often recognized the powerful "anchor[ing]" effect of a

21

"miscalculated Guidelines range" on a district court's thinking about the appropriate sentence, even where the court "asserted it was 'not moved by' the Guidelines." *United States v. Bennett*, 839 F.3d 153, 163 & n.8 (2d Cir. 2016). Tellingly, here the district court repeatedly acknowledged the importance of the Guidelines, stating "I need to find the guidelines first. I'm required to make a finding on the guidelines,"—and that to "find a just punishment," the guidelines "are a means of getting there." App'x at 102. It declined the government's suggestion that it take the bribery conduct into account in its Section 3553(a) analysis rather than in its selection of a guideline.

The district court "returned multiple times" to the Guidelines range in framing its choice of the appropriate sentence. *See Bennett*, 839 F.3d at 163. At a minimum, it appears that the district court's error "may well have anchored [its] thinking as to what an appropriate sentence would be." *Id.* It is certainly not "clear" from this record, *see Molina-Martinez*, 136 S. Ct. at 1347, that the miscalculation had no influence on the sentence, *see United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010) ("If the district court miscalculates the typical sentence at the outset, it cannot properly account for atypical factors and we, in turn, cannot be sure that the court has adequately considered the §

22

3553(a) factors"); *cf. United States* v. *Guzman*, 282 F.3d 177, 183 (2d Cir. 2002)

(vacating a sentence where the district court "began its computation" with "the

offense level for the uncharged federal offense of bribery, rather than . . . the level

prescribed for the offense of conviction.").

The importance of the correct Guidelines range is particularly evident in

this case because the sentence was "conspicuous for its position as the lowest

sentence within what the District Court believed to be the applicable range."[7]

*Molina-Martinez*, 136 S. Ct. at 1347. Further, had the district court applied the

fraud guideline, which provided for a sentencing range of 6 to 12 months, it

would have had to vary upward by more than double the applicable range to

reach the sentence, 30 months, that it imposed. The court did not explain why

such a significant variance was appropriate. Absent such an explanation, we

cannot be certain that the court's calculus would not have been altered had it

---

[7] Notably, the correctly calculated range under the commercial bribery guideline—albeit the incorrect guideline, but the one of which the district court was cognizant throughout the hearing—provided 24 months rather than 30 months as the lowest sentence in the applicable range. That was also, incidentally, the same sentence recommended by the Probation Office. We cannot be confident that this too would not have affected the district court's thinking.

appreciated the full extent of the upward variance it was contemplating. We therefore cannot be "confident," despite the district court's assertion to the contrary, that if the proper Guidelines range was before it—or even if it had properly calculated the commercial-bribery guideline range—the court would have imposed the same sentence of 30 months' imprisonment. *See e.g., United States* v. *Malki*, 609 F.3d 503, 511 (2d Cir. 2010) ("Although [the district court] also stated that a lesser sentence would be 'inappropriate,' we cannot be confident that [it] would have imposed the same sentence had [it] understood that the bottom of the correct guideline was 58 months less than the bottom of the guideline [it] thought was applicable.").

Even assuming, arguendo, the district court would have imposed the same sentence under the fraud guideline by varying upward, it did not state its justifications with enough specificity to allow us to affirm on this ground. A district court must "determine whether to impose a Guidelines or a non-Guidelines sentence." *United States v. McGinn*, 787 F.3d 116, 129 (2d Cir. 2015). A district court that chooses to "impos[e] a non-Guidelines sentence . . . should say why [it] is doing so," bearing in mind that "a major departure from the Guidelines should be supported by a more significant justification than a minor

one." *Cavera*, 550 F.3d at 193 (brackets, internal quotation marks, and citation omitted). A non-Guidelines sentence requires a written statement of reasons that lays out the justification for a non-Guidelines sentence "with specificity." *Id*. at 192-93 (citation omitted); *see* 18 U.S.C. § 3553(c)(2). This requirement is not an empty formality. *See Gall v. United States*, 552 U.S. 38, 46, 49-50 (2007).

Accordingly, we vacate and remand for Huberfeld's resentencing. On remand, the district court must use Section 2B1.1, the fraud guideline, as "the offense guideline section . . . applicable to the offense of conviction." U.S.S.G. § 1B1.2(a). If the district court desires to impose an upward variance based on the seriousness of the crime, it may. "Notwithstanding the Sentencing Commission's assessment, reflected in the correctly applied Guidelines, of the seriousness of the offense, in selecting an appropriate sentence the district court may make its own evaluation of the characteristics of the defendant, and the need of the sentence to punish, deter, and protect the public." *United States v. Wernick*, 691 F.3d 108, 119 (2d Cir. 2012). Moreover, in selecting the appropriate sentence, the district court is also required to consider "the nature *and circumstances* of the offense," 18 U.S.C. § 3553(a)(1) (emphasis added), and thus may consider the factual context of the fraud as well as the statutory elements of the offense. It must do so,

25

however, by complying with the various procedural requirements, set forth above, which both ensure that the sentencing court carefully considers the need for a variance, and allows for meaningful appellate review. *See* 18 U.S.C. § 3553(c)(2).

### B. Substantive Reasonableness

Huberfeld argues that his custodial sentence is substantively unreasonable because the district court focused exclusively on the uncharged bribery offense rather than the offense of conviction. He also argues the district court gave insufficient weight to certain Section 3553(a) factors.

Because we hold that Huberfeld must be resentenced due to procedural error, we decline to rule on the issue of substantive unreasonableness. *See Gall*, 552 U.S. at 51 (the appellate court "must first ensure that the district court committed no significant procedural error," and "[a]ssuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence").

## II. Restitution

Huberfeld next argues that the district court erred in ordering him to pay $19 million in restitution to COBA because COBA was not a direct or proximate

victim of the wire-fraud offense. The MVRA requires a sentencing court to order that "the defendant make restitution to the victim of the offense" for certain crimes, including where (a) the offense was "committed by fraud or deceit" and (b) "an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii), (c)(1)(B). "Section 3663A(a)(1) does not authorize the court to order a defendant to pay restitution to any person who was not a victim of the offense of which the defendant was convicted." *United States v. Reifler*, 446 F.3d 65, 121 (2d Cir. 2006). The MVRA defines a victim as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2).

As we did with respect to the district court's Guidelines analysis, we similarly conclude that it erred by imposing a restitution order against Huberfeld as if he were convicted of the uncharged bribery scheme. Our precedent forecloses such an expansive view of a "victim" under the MVRA. *See In re Local #46 Metallic Lathers Union & Reinforcing Iron Workers & Its Associated Benefit & Other Funds*, 568 F.3d 81, 85-86 (2d Cir. 2009).

In *Local #46*, a business owner issued checks to fictitious vendors; cashed those checks; and used the proceeds to pay his employees in cash, thereby

avoiding obligations to the IRS and to the employees' union. *Id.* at 82-83. He was initially charged with money laundering and defrauding the union, but the government agreed not to bring the latter charge in exchange for his guilty plea. *Id.* at 83-84. At the defendant's sentencing, the union sought restitution, claiming that it was a victim of the money-laundering scheme because the money laundering was undertaken with the purpose of making cash payments to employees, which deprived the union of "benefits due under collective bargaining agreements." *Id.* at 85.

We affirmed the district court's denial of the union's restitution request, noting that the defendant "admittedly had a plan to obtain laundered money and then use that money to pay [the company's] employees in cash and simultaneously avoid paying taxes and union obligations." *Id*. at 86. But "[n]otwithstanding what [the defendant] planned to do with the laundered funds once he had them in his possession, the 'offense' to which he pleaded guilty was solely and exclusively the conspiracy to engage in money laundering." *Id.* at 87. The union's "expanded definition of 'victim,'" we said, "ignores the term 'offense' in § 3663A and would force the sentencing court to ascertain some overarching uncharged scheme or conspiracy, one element of

28

which is the specific offense to which the defendant pleaded guilty." *Id.* Rejecting

that approach, we determined that the union was not entitled to restitution

under the MVRA. *See id.* at 88.

Local #46 resolves this issue in Huberfeld's favor.[8] The government does

not dispute that "none of the conduct within the charged wire fraud conspiracy

itself injured COBA." Appellee's Br. at 79. Instead, it emphasizes that the

purpose of the charged scheme was to mask the bribe, which ultimately hurt

COBA. But that rationale grafts an "overarching uncharged scheme" onto a

---

[8] Contrary to the government's argument, *Local #46* does not reflect a "flawed approach" to interpreting the MVRA, which this Court has abandoned in subsequent decisions. Appellee's Br. at 80. Rather, the decisions on which the government relies are cases in which we found that it was appropriate for restitution to encompass losses that were imposed in service of the offense of conviction. *See, e.g.*, *United States v. Desnoyers*, 708 F.3d 378, 390 (2d Cir. 2013); *United States v. Archer*, 671 F.3d 149, 171-72 (2d Cir. 2011); *United States v. Paul*, 634 F.3d 669, 676-77 (2d Cir. 2011). In *Local #46*, as in Huberfeld's case, the fraud of conviction was arguably in service of a larger scheme that caused the union's losses, but those losses were not effectuated in furtherance of the fraudulent scheme itself. *See* 568 F.3d at 87. Thus, *Local #46* is fully consistent with and distinguishable from the cases on which the government relies. In each of those cases, therefore, the conviction was for the overarching scheme, and restitution was sought for actions that were within and necessary to that "single scheme," *Archer*, 671 F.3d at 171-72, but here it is the opposite: the conviction was for a scheme that was outside of the uncharged, overarching scheme of defrauding COBA.

charging instrument that fails to allege that scheme. *Local #46*, 568 F.3d at 87. In short, it is not enough for the ultimate purpose of the alleged wire fraud to be detrimental to COBA. Under the MVRA, COBA must have been directly and proximately harmed by the convicted conduct.

COBA's losses could not have been caused by the convicted wire-fraud conduct because the wire fraud postdated COBA's investment. While the superseding information alleges that the purpose of the wire fraud was to reimburse Rechnitz for paying off Seabrook, the convicted wire fraud could not have influenced whether the investment was made in the first instance. Our recent decision in *United States v. Calderon* supports this conclusion. 944 F.3d 72, 97 (2d. Cir. 2019) (finding that restitution was inappropriate because the charged fraud occurred "*after* [the domestic banks] had *already* decided to offer loans to the relevant foreign banks."). Although the government argues that the charged scheme stretched from 2013 to 2015 "as alleged in the Superseding Indictment," Appellee's Br. at 81, the government references the wrong charging instrument. Huberfeld pled guilty to the superseding information limited to events in December 2014: it stated that Huberfeld "conspire[d]" with others "[i]n or around December 2014" and listed overt acts that occurred that same month.

30

App'x at 41-43. Accordingly, COBA does not qualify as a victim under the MVRA. We therefore reverse the district court's $19 million restitution award to COBA.

## III. Reassignment

Finally, Huberfeld argues for reassignment to a different district court judge. Reassignment is not warranted. "We will grant a request for reassignment on remand only in 'unusual circumstances.'" *United States v. Singh*, 877 F.3d 107, 122 (2d Cir. 2017) (quoting *United States v. Brennan*, 395 F.3d 59, 75 (2d Cir. 2005)). Huberfeld has failed to show that this is the type of rare circumstance where the distinguished district court judge would not follow our guidance.

## CONCLUSION

For the foregoing reasons, we vacate the district court's judgment of conviction and reverse the restitution order. We remand for futher proceedings consistent with this opinion.