United States of America v. Rechnitz

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2022
No. 20-1011-cr

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

JONA RECHNITZ,
*Defendant-Appellant.*

On Appeal from a Judgment of the United States District Court for
the Southern District of New York.

ARGUED: JUNE 2, 2023
DECIDED: JULY 26, 2023

Before: NARDINI, PÉREZ, AND KAHN, *Circuit Judges*.

Defendant-Appellant Jona Rechnitz pleaded guilty in the United States District Court for the Southern District of New York to conspiracy to commit honest services wire fraud in violation of 18 U.S.C. § 1349. Among other things, Rechnitz's underlying criminal

conduct included facilitating a bribe that resulted in the Correction Officers' Benevolent Association ("COBA"), a New York correctional officers' union, investing $20 million with Platinum Partners ("Platinum"), a hedge fund that ultimately declared bankruptcy amid government investigations into fraud.

Following his guilty plea, Rechnitz's case was reassigned to another district judge (Alvin K. Hellerstein, *J.*) for sentencing. After his sentencing hearing but prior to his final restitution determination, Rechnitz moved to have his case reassigned to another district judge. His motion was premised on the recently discovered personal relationship between the district judge in his case and Andrew Kaplan, a defendant and cooperating witness in the ongoing prosecutions against those involved in the Platinum fraud. The district court denied that motion and ordered Rechnitz to pay restitution to COBA for all of its remaining losses.

On appeal, Rechnitz argues that his case should have been reassigned pursuant to 28 U.S.C. § 455(a) or (b) for resentencing or, in the alternative, that the district court erred in imposing restitution for all of COBA's losses. We hold that the district judge erred in not recusing himself under § 455(a). The judge not only had a close, near-paternal relationship with Kaplan, but he also advised Kaplan on how to proceed in his pending criminal case arising from the Platinum fraud. The judge's relationship with Kaplan was sufficiently close, and Kaplan's case was sufficiently related to Rechnitz's case, that a reasonable person would have questioned the district court's impartiality. Finally, we note that the district court initiated an *ex parte*, off-the-record phone call with the United States Attorney's Office regarding Rechnitz's restitution payments while this appeal was pending. Such communications are disfavored, and the communication here was particularly ill-advised under the circumstances. Accordingly, we REMAND the case for reassignment to a different district judge and for plenary resentencing.

DAVID ABRAMOWICZ, Assistant United States Attorney (Lara Pomerantz, Assistant United States Attorney, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

NOAM BIALE (Michael Tremonte and Maya Brodziak, on the brief), Sher Tremonte LLP, New York, NY, *for Defendant-Appellant*.

PER CURIAM:

Defendant-Appellant Jona Rechnitz pleaded guilty pursuant to a cooperation agreement in the United States District Court for the Southern District of New York to conspiracy to commit honest services wire fraud in violation of 18 U.S.C. § 1349. Among other things, Rechnitz's underlying criminal conduct included facilitating a bribe paid by Murray Huberfeld, the co-founder of the hedge fund Platinum Partners ("Platinum"), to Norman Seabrook, the president of the Correction Officer's Benevolent Association ("COBA"), the largest correctional officers' union in New York City. In return for the

3

bribe, Seabrook invested $20 million of COBA funds with Platinum. When Platinum later declared bankruptcy amid government investigations into fraud and other wrongdoing at the fund, COBA lost $19 million of that investment.

After Rechnitz's guilty plea, but before his sentencing, his case was reassigned to another district judge (Alvin K. Hellerstein, *J.*). The district court sentenced Rechnitz to five months of imprisonment, followed by three years of supervised release. The district court ultimately ordered Rechnitz to pay $12.01 million in restitution to COBA, its remaining unrecovered losses from Platinum's collapse.

After his initial sentencing, but before the final determination on restitution, Rechnitz moved to have his case reassigned to another district judge. His motion was premised on a recently discovered personal relationship between the sentencing judge and Andrew Kaplan, a defendant and cooperating witness in the ongoing prosecutions of those involved in the Platinum fraud. Despite

granting a parallel motion for recusal by Rechnitz's co-conspirator Huberfeld, the judge denied Rechnitz's motion and proceeded to adjudicate the restitution order.

On appeal, Rechnitz argues that his case should be reassigned for resentencing pursuant to 28 U.S.C. § 455(a) or (b), or, in the alternative, that the restitution order should be vacated because it erroneously covers all of COBA's losses. We hold that the district judge erred in not recusing himself under § 455(a). Not only did the district judge have a close, near-paternal relationship with Kaplan, he also advised Kaplan on how to proceed in his pending criminal case arising from the Platinum fraud. The judge's relationship with Kaplan was sufficiently close, and Kaplan's case was sufficiently related to Rechnitz's case, that a reasonable person would have questioned the district court's impartiality. Finally, we note that the district court initiated an *ex parte*, off-the-record phone call with the United States Attorney's Office regarding Rechnitz's restitution

5

payment while this appeal was pending. Such communications are disfavored, and the communication here was particularly ill-advised under the circumstances. Accordingly, we REMAND the case for reassignment to a different district judge and for plenary resentencing.

## I. Background

### A. The offense conduct

On June 8, 2016, Rechnitz pleaded guilty pursuant to a cooperation agreement to a single-count information charging him with conspiring to commit honest services wire fraud in violation of 18 U.S.C. § 1349. That charge arose out of Rechnitz's participation in two distinct bribery schemes.

The first scheme involved the bribery of numerous public officials in exchange for beneficial official acts from 2008 through 2015. Rechnitz and a co-conspirator, Jeremy Reichberg, gave numerous gifts to New York Police Department officials, including travel, home renovations, sports tickets, expensive meals, and access

6

to prostitutes. In return, Rechnitz and Reichberg received benefits from the people they bribed, including rides in NYPD vehicles for themselves and their associates, the promotion or transfer of NYPD officers with whom they sought to curry favor, pistol permits for themselves and others, and a police escort of a car carrying Rechnitz's boss through the Lincoln Tunnel, including a partial lane closure. Rechnitz and Reichberg also received benefits from elected officials in the New York City and Westchester County governments in exchange for contributions to campaigns and to pet political projects. These benefits included favorable treatment from the New York City Department of Buildings and the title of Westchester County Chaplain for Rechnitz and Reichberg.

In the second bribery scheme, Rechnitz orchestrated a conspiracy that involved bribing Norman Seabrook, the president of COBA. In late 2013, Murray Huberfeld, the founder and co-owner of the hedge fund Platinum Partners, asked Rechnitz for help attracting

institutional investors to the fund. That December, Rechnitz took Seabrook and others on a trip to the Dominican Republic, during which Rechnitz told Seabrook that he could personally make money if he invested COBA's funds with Platinum. Seabrook agreed to the scheme, and Rechnitz and Huberfeld promised to pay him a percentage of Platinum's profits from the COBA investment; the pair estimated that Seabrook's take would exceed $100,000 annually.

In 2014, Seabrook arranged three separate investments in Platinum by COBA, totaling $20 million. He then sought his kickback payment from Rechnitz, who, acting on Huberfeld's instructions, gave Seabrook a Ferragamo handbag containing $60,000 in cash on December 11, 2014. That same day, Rechnitz's assistant prepared a fraudulent $60,000 invoice to Platinum for tickets to the New York Knicks, which Rechnitz then forwarded by email to Huberfeld, who had promised to reimburse him for the payment to Seabrook. Three days later, Platinum cut a check to Rechnitz for $60,000.

Some two years later, Platinum collapsed amid investigations by the Securities Exchange Commission and the U.S. Department of Justice. Executives at Platinum were charged with overvaluing assets and concealing cashflow problems, and separately with an attempt to defraud third-party bondholders of an oil company in which Platinum had invested. COBA lost $19 million of the $20 million that it invested with Platinum. There is no evidence that Rechnitz was aware of Platinum's issues at the time of the COBA investments, nor that he was compensated for his role in arranging the Seabrook bribe.

## B. Seabrook and Huberfeld's prosecutions

In May 2016, Rechnitz began cooperating with the government in its investigation of the bribery schemes with which he was involved. On June 8, 2016, Rechnitz pleaded guilty pursuant to a cooperation and plea agreement, in which the government agreed to file a motion for a downward departure under Section 5K1.1 of the United States Sentencing Guidelines if it determined that Rechnitz

had provided substantial assistance to investigators and complied with his obligations under the agreement.

Seabrook and Huberfeld were successfully prosecuted for their roles in the bribery conspiracy. At first, they were tried together in a joint trial (at which Rechnitz testified) before Judge Andrew Carter, but on November 16, 2017, the court declared a mistrial. The case was then re-assigned to Judge Hellerstein.

On July 16, 2018, in Seabrook's case, the government filed a letter with the district court flagging two personal relationships of the newly assigned district judge that might have potential relevance to Seabrook's case. Those relationships—with Gilad Kalter, the former Chief Operating Officer of Platinum, and with Laura Berkowitz, the wife of Huberfeld—were both so attenuated that neither the government nor Seabrook believed they required recusal. Even so, the government and Seabrook's counsel agreed that the court needed to decide the recusal issue itself.

On July 17, 2018, the district judge held a pre-trial hearing during which he further explained these relationships. The judge explained on the record that each relationship was very indirect and agreed with Seabrook and the government that neither required recusal. Then, the court announced that it would discuss another relationship with Seabrook and the government in an off-the-record sidebar, which was not recorded in the transcript. Upon the conclusion of the sidebar, at the urging of the parties, the judge then placed on the record the information that had just been discussed. That disclosure concerned the district judge's personal relationship with Andrew Kaplan and his family. Kaplan was the former Chief Marketing Officer of Platinum and a cooperating witness in ongoing investigations and prosecutions in the Eastern District of New York arising out of Platinum's collapse. The district judge stated:

> I have known Andrew Kaplan since he was born. He and one of my daughters grew up together, went to school together, were friends together. His sister and my eldest daughter remain close friends. His father was a good

11

friend of mine but passed away about five, six years ago, and his mother remains a very good friend of mine, so there is that relationship.

*United States v. Seabrook*, 16-cr-467, Dkt. entry between #218 and #219, July 17, 2018, Hearing Tr., 5:11–18. The district judge made no mention about his having any involvement in, or knowledge of, Kaplan's role as a cooperating witness in the Platinum prosecutions. *See id.* The judge further stated, "I can't see that whatever happened, whatever conduct occurred at Platinum affects the issues of this case, which is an honest services issue." *Id.* at 5:19–21. Neither the government nor Seabrook objected to the judge continuing to preside over Seabrook's retrial. *Id.* at 6:1–3. It appears that the transcript of this hearing was neither prepared nor posted to Seabrook's docket in the course of his prosecution.[1] There is no indication that counsel for

---

[1] We consider the record before us on appeal to be supplemented by that transcript, which has now been prepared at the request of this Court, and we therefore direct the Clerk of the Court to file it on the docket for this appeal.

Huberfeld or Rechnitz were at this hearing, or that these disclosures were conveyed to them.

On August 15, 2018, following his individual re-trial, Seabrook was convicted of all counts against him, and on February 8, 2019, the district court sentenced him to 58 months of imprisonment followed by three years of supervised release, and imposed $19 million in restitution. This Court affirmed that conviction.[2] *United States v. Seabrook*, 814 F. App'x 661 (2d Cir. 2020).

On May 25, 2018, Huberfeld pleaded guilty to a one-count superseding information charging him with conspiracy to commit wire fraud in violation of 18 U.S.C. § 371. This charge was based on Huberfeld's conspiracy with Rechnitz to defraud Platinum of the

---

[2] On February 23, 2023, the district court granted Seabrook's motion for a reduction of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A), relying on the sentencing disparity between Huberfeld and Seabrook that resulted from Huberfeld's re-sentencing, discussed below. *United States v. Seabrook*, 2023 WL 2207585, at *3–4 (S.D.N.Y. Feb. 23, 2023). Seabrook's carceral sentence was reduced to the amount of time he had served by that point, which was approximately 21 months; Seabrook's term of supervised release and the restitution he was ordered to pay were unchanged. *See id.*

$60,000 it paid for non-existent Knicks tickets—money that was actually used by Rechnitz to bribe Seabrook. On February 12, 2019, the district court sentenced Huberfeld principally to a term of 30 months of imprisonment followed by three years of supervised release, and ordered restitution of $19 million to COBA, for which Huberfeld was jointly and severally liable with Seabrook.

Huberfeld appealed, and on August 4, 2020, this Court vacated his sentence, finding that the district court erred by applying the Sentencing Guideline for commercial bribery rather than for fraud, and erred in imposing restitution against Huberfeld as though he had been convicted of the bribery scheme. *United States v. Seabrook*, 968 F.3d 224, 231–36 (2d Cir. 2020).

On remand, Huberfeld sent the district court a letter on November 30, 2020, seeking reassignment of his case to a different judge. Huberfeld's letter was premised partially on the information that first came to light during the July 17, 2018, pre-trial conference in

14

Seabrook's re-trial before Judge Hellerstein. The information discussed in that conference had not been disclosed to Huberfeld, who had only "recently learned" of the relationship between Kaplan and the district judge. App'x 261. Huberfeld's letter contained additional information which had not been disclosed by the judge in the July 17, 2018, conference. *Id.* Specifically, it indicated that Huberfeld had learned from witnesses who had spoken with Kaplan that Kaplan considered the district judge to be "like a father" to him, and that beginning around November 2016, the district judge and Kaplan had discussed whether Kaplan should accept the government's plea offer regarding his Platinum-related criminal conduct. App'x 262. Huberfeld's letter asserted that in advising Kaplan, the district judge and Kaplan had discussed the significant monetary losses associated with the charges against Kaplan, and Kaplan's feelings towards other Platinum executives. *Id.* For reasons

15

that are not apparent, Huberfeld's letter was never posted on the public docket associated with his case.

On December 1, 2020, an entry was placed on Huberfeld's docket indicating that the case had been reassigned. The docket did not indicate any reason for the reassignment, nor did it indicate that it had occurred at a party's request. Huberfeld's case was reassigned to Judge Lewis Liman, who sentenced Huberfeld principally to a term of seven months of imprisonment followed by one year of supervised release, and ordered restitution of $60,000 to be paid to Platinum.

## C. Rechnitz's sentencing

On October 16, 2019, the government filed its sentencing submission in Rechnitz's case, advising the court that it intended to move for a downward departure at sentencing from the Guidelines range, pursuant to Section 5K1.1. The government sought a downward departure with "particular enthusiasm," because Rechnitz had been "one of the single most important and prolific

white collar cooperating witnesses in the recent history of the Southern District of New York." App'x 37. The government further stated that "Rechnitz did not appear to know that Platinum was a fraud, or even that it was a bad investment." App'x 54.

On October 21, 2019, Rechnitz filed his sentencing submission. He sought a non-custodial sentence of time served, and agreed with the Probation Office's determination that he should pay restitution of $1,206,000, calculated as the NYPD's loss of $6,000 and COBA's loss of $1,200,000 in management fees charged by Platinum. Rechnitz argued that he should not be required to pay the full $19 million in restitution because COBA's losses were attributable to the unforeseeable and independent collapse of Platinum, the result of separate criminal conduct of which he had no knowledge and in which he played no role.

On October 30, 2019, the district court issued an order proposing revisions to the Presentence Investigation Report. Those

revisions included, among other things, a finding that Rechnitz "had to know" both that Platinum was a "high-risk fund" and that "Murray Huberfeld was willing to pay a bribe to obtain funds to satisfy a liquidity shortage, thus making it reasonably foreseeable that an investment of pension funds risked the loss of those funds."  App'x 131–32.  The district court further ordered the Presentence Report modified to propose restitution of $19 million to COBA, jointly and severally with Seabrook and Huberfeld.

Both the government and Rechnitz responded to this order.  On December 6, 2019, the government noted in its submission that it had no evidence that Rechnitz was aware of problems at Platinum, and that it credited his trial testimony that he believed Platinum to be financially sound.  It further noted that Rechnitz was situated differently than Huberfeld and Seabrook, because the former surely knew of the issues at Platinum, and the latter received, ignored, and concealed clear warnings about COBA's investment in the hedge

18

fund. Rechnitz similarly disputed the district court's factual assertion that he was aware of the issues at Platinum, and again argued that the losses caused by Platinum's failure should not be attributed to him for restitution purposes.

On December 20, 2019, the district court held Rechnitz's sentencing hearing. As to restitution, the court found that the losses associated with Platinum's failure were within the "zone of risk" created by the bribery scheme, because "a bribe closes the mind of the wise and avoids the kinds of skeptical judgment that are necessary before investing fiduciary funds." App'x 189. The court ordered Rechnitz to pay COBA $10 million in restitution, jointly and severally with Seabrook and Huberfeld,[3] a figure based on the size of the investment by COBA that Rechnitz and Seabrook discussed initially, and not based on the disputed factual findings included in the district

---

[3] At the time of Rechnitz's sentencing hearing, this Court had not yet ruled on Huberfeld's appeal, and thus Huberfeld's initial sentence, including the full $19 million of restitution, remained standing. *See Seabrook*, 968 F.3d at 231–36.

court's October 2019 Order. The court also sentenced Rechnitz to five months of imprisonment, followed by three years of supervised release (the first five months of which were to be served under house arrest).

The court entered judgment on March 3, 2020, and Rechnitz filed a timely notice of appeal.

### D. COBA's intervention

On February 27, 2020, after the oral imposition of the sentence but before the judgment had entered, COBA moved for restitution under the Crime Victims' Rights Act, 18 U.S.C. § 3771, and the related restitution provisions of the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3664. COBA sought to hold Rechnitz jointly and severally liable for its remaining $14.25 million loss following Huberfeld's then-payment of $4.75 million in restitution.[4] COBA

---

[4] The district court initially denied COBA's motion on the grounds that it lacked jurisdiction to consider it. *See United States v. Rechnitz*, 2020 WL 1467888, at *1–2 (S.D.N.Y. Mar. 26, 2020). This Court granted COBA's petition for mandamus,

20

contended that Rechnitz was as culpable as Seabrook and Huberfeld, and that he should be ordered to pay full restitution immediately. Rechnitz opposed this motion on the grounds that it was untimely and, even if it were timely, the district court had discretion to apportion liability among defendants in proportion to their culpability.

## E. Rechnitz's motion for reassignment and the district court's revised restitution order

On December 10, 2020, while COBA's motion for additional restitution was still pending, Rechnitz filed a motion seeking reassignment to a different judge. That motion was born out of the December 1, 2020, reassignment of Huberfeld's case. Following that reassignment—which *did* appear on the public docket in Huberfeld's case, though without explanation—Rechnitz's counsel received from

---

returning jurisdiction to the district court with a mandate to "reconsider its assessment of [Rechnitz's] culpability and financial condition in light of the new evidence presented by [COBA] and any other factors found relevant by the district court." *See United States v. Rechnitz*, 16-cr-389, Dkt. #92.

the government a copy of Huberfeld's November 30, 2020, letter requesting reassignment. Rechnitz's receipt of Huberfeld's request for reassignment was the first notice he received of the relationship between the district judge and Kaplan.

Rechnitz sought recusal to "avoid the appearance of any impropriety and in an abundance of caution." App'x 260. Rechnitz's primary concern was that the size of his restitution turned largely on the credibility of his claim that he had believed "in the soundness of Platinum Partners as an investment vehicle," and that the district judge might have obtained "extrajudicial" information regarding the case from Kaplan, which Rechnitz would not have had the opportunity to challenge. *Id*.

On December 17, 2020, the district court entered a four-page written order denying Rechnitz's motion for reassignment. The judge explained:

> Kaplan's father, who died more than 10 years ago, was my close friend, and his family and mine have been close

22

for 55 years. I told his son after his father died that I would be available to him to discuss any problem he might have, as if I were his father. When Kaplan was indicted and was offered a plea in exchange for his cooperation, he came to me to help him think through his options. . . . He asked me if he could discuss his concerns with me. Although Kaplan had an excellent defense lawyer, he felt that I had unique knowledge of his family concerns and I felt that I should consider his request as if it were made by my son and help him think through his options.

App'x 264. These discussions, the district judge said, did not address the "the underlying facts or law of the case against Kaplan." *Id.* In denying the motion for reassignment, the judge found that his relationship with Kaplan, and the case pending against Kaplan in the Eastern District of New York, were unrelated to the restitution issue involving Rechnitz, in part because "there is no suggestion that [Rechnitz] had any relationship with Kaplan." App'x 265. The district judge also stated that he had no "extra record information" regarding Rechnitz or Platinum, that he did not believe that Rechnitz's restitution liability turned on his knowledge of the

23

"soundness" of Platinum, and that Huberfeld's case was distinct from that of Rechnitz, as Huberfeld was directly involved in Platinum. *Id*.

Rechnitz moved for reconsideration. Among other things, he argued that he and Kaplan had numerous interactions throughout the COBA bribery and investment scheme, and that he had discussed the relationship between the bribery and investment scheme during his testimony in both the joint trial of Seabrook and Huberfeld (before Judge Carter) and the subsequent retrial of Seabrook before Judge Hellerstein. In his motion, Rechnitz characterized Kaplan as part of "the core group" at Platinum that was involved in securing COBA's investment. Rechnitz also noted that his primary argument against heightened restitution turned on whether COBA's damages were proximately caused by the bribe, which itself turned on whether the intervening criminal conduct of those at Platinum (including Kaplan) was to blame.

On January 8, 2021, the district judge entered a written ruling that denied the motion for reconsideration. He rejected the premise that Kaplan had served as one of Rechnitz's "primary contacts" at Platinum, and described Rechnitz's arguments as "made-up, [and] intended to create an issue for disqualification that does not exist." *United States v. Rechnitz*, 2021 WL 75671, at *2 (S.D.N.Y. Jan. 8, 2021).

That same day, the district court ordered Rechnitz to provide personal financial information, previously disclosed only to the Probation Office, directly to the district court and to COBA. Rechnitz sought reconsideration of this order, noting that the law presumptively bars the disclosure of such information to crime victims. The district court denied this motion. *United States v. Rechnitz*, 2021 WL 127228, at *1–2 (S.D.N.Y. Jan. 13, 2021). Rechnitz petitioned this Court for a writ of mandamus seeking reassignment of his case and barring the disclosure of his personal financial information, which this Court granted as to the disclosure, but denied

as to the reassignment, concluding that Rechnitz had failed to satisfy his exceptionally high burden on mandamus of demonstrating a "clear and indisputable right to issuance of the writ on that issue." *In re Jona Rechnitz*, No. 21-77, Dkt. #62 (2d Cir. July 1, 2021).

On November 9, 2021, the district court granted COBA's motion against Rechnitz for the full amount of COBA's remaining unrecovered loss—by then, $12.01 million. *See United States v. Rechnitz*, 2021 WL 5232395, at *9 (S.D.N.Y. Nov. 9, 2021). This decision was based in part on Huberfeld's resentencing, which significantly lowered COBA's ability to fully recover its losses. The court also reiterated that the full $19 million of COBA's loss was within the "zone of risk" created by Rechnitz's bribe, because "Rechnitz exposed COBA to the risk that Seabrook, motivated by the bribe, would forego the level of caution required of someone in his position." *Id.* at *6.

Rechnitz filed a timely appeal of the revised restitution order.

**F. The district court's post-sentencing *ex parte*, off-the-record communication**

On December 23, 2022, while his appeal was pending before this Court, Rechnitz filed a letter pursuant to Fed. R. App. P. 28(j) (the "28(j) Letter"). The 28(j) Letter included, attached as an exhibit, a letter dated December 1, 2022, from the United States Attorney's Office for the Southern District of New York to Rechnitz's counsel, documenting an *ex parte*, off-the-record phone call made by the district judge on November 15, 2022, to the Assistant United States Attorney working on Rechnitz's case.[5] The government's letter summarized the phone call as follows:

- [The district judge] asked how much Mr. Rechnitz has paid in restitution. He commented that he does not like all of Mr. Rechnitz's travel requests, and said that such requests are reasonable individually, but too frequent.

- [The district judge] also stated that Mr. Rechnitz is sly, cannot be trusted, and uses religion as a cloak.

---

[5] At oral argument, counsel for the government represented that there were no additional *ex parte* communications between the district judge and the government in the course of the case against Rechnitz.

- In response to [the district judge's] request for information about Mr. Rechnitz's restitution, [the AUSA] offered to ask Mr. Rechnitz's counsel to make a submission to the [district] [c]ourt addressing the issue. [The district judge] asked [the AUSA] not to speak to [Rechnitz's] counsel about this and instead advised her to find the information from the Clerk of Court.

- [The district judge] expressed frustration with the amount of time Mr. Rechnitz's appeal has been pending.

Dec. 23, 2022, 28(j) Letter, Ex. A, Gov't Letter dated Dec. 1, 2022.[6]

## II. Discussion

On appeal, Rechnitz argues that the district court improperly failed to recuse itself in violation of 28 U.S.C. § 455(a) and (b). In the alternative, Rechnitz argues that the district court erred by ordering him to pay restitution for all of COBA's losses. For the reasons that follow, we find that the district judge should have recused himself,

---

[6] Fed. R. App. P. 28(j) permits a party to "advise the circuit clerk by letter" of "pertinent and significant authorities [that] come to a party's attention after the party's brief has been filed—or after oral argument but before decision." The 28(j) Letter, although styled as a filing pursuant to Rule 28(j), did not serve to flag additional authorities for this Court, and is more accurately construed as a motion to supplement the record. Neither party objects to our consideration of the letter, and so we deem the record to have been supplemented.

and we remand the case for reassignment and plenary resentencing. Accordingly, we do not reach the merits of Rechnitz's challenge to the restitution order.

## A. Standard of review

We review a district court's decision not to recuse itself for abuse of discretion. *United States v. Wedd*, 993 F.3d 104, 114 (2d Cir. 2021). "A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001) (footnotes omitted). Given that standard, we will rarely disturb a district court's decision not to recuse itself.

*See ISC Holding AG v. Nobel Biocare Fin. AG*, 688 F.3d 98, 107 (2d Cir. 2012).[7]

## B. Statutory recusal under 28 U.S.C. § 455

Rechnitz contends that the district judge should have recused himself under 28 U.S.C. § 455(a), (b)(1), and (b)(5). Section 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Section

---

[7] The government contends that Rechnitz raises a portion of his argument for the first time on appeal, and it should therefore be reviewed only for plain error. Specifically, it contends that Rechnitz failed to argue below that Kaplan, who may be ordered to pay restitution for his role in the Platinum case, may have a financial interest in the outcome of the restitution order against Rechnitz. We are unpersuaded. To be sure, Rechnitz's arguments for recusal are more developed on appeal than they were before the district court. However, across his initial motion for reassignment and his motion for reconsideration before the district court, Rechnitz sufficiently flagged the restitution issue as a ground for reassignment, and raised all the same statutory arguments that he raises here. Accordingly, Rechnitz's arguments on appeal can be fairly read into his arguments before the district court, and we decline to apply plain error analysis. *See United States v. Sprei*, 145 F.3d 528, 533 (2d Cir. 1998) ("In interpreting Rule 51, [this Court has] emphasized that [a]n objection is adequate which fairly alerts the court and opposing counsel to the nature of the claim." (internal quotation marks omitted)); *see also Wedd*, 993 F.3d at 115 (applying plain error analysis to recusal issue where defendant, among other things, failed to "invoke Section 455(a) at all below, or [to] frame his request for reassignment in any way around an impropriety in the district court continuing to preside over the case").

455(b) requires, in relevant part, that a judge recuse himself in any case where he has "a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding," or where "[h]e or his spouse, or a person within the third degree of relationship to either of them" is "known by the judge to have an interest that could be substantially affected by the outcome of the proceeding" or is "to the judge's knowledge likely to be a material witness in the proceeding." § 455(b)(1), (b)(5)(iii)–(iv).

We evaluate partiality under § 455(a) "on an *objective* basis, so that what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994); *see also Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988) ("The goal of section 455(a) is to avoid even the appearance of partiality." (internal quotation marks omitted)). In making that objective analysis, we consider "whether a reasonable person, knowing all the facts, would conclude that the trial judge's impartiality could

31

reasonably be questioned." *United States v. Thompson*, 76 F.3d 442, 451 (2d Cir. 1996) (internal quotation marks and alteration omitted); *see also* Code of Conduct for United States Judges, Canon 2(A) ("An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's honesty, integrity, impartiality, temperament, or fitness to serve as a judge is impaired."). In close cases, "the balance tips in favor of recusal." *Ligon v. City of New York*, 736 F.3d 118, 124 (2d Cir. 2013) (internal quotation marks omitted), *vacated in part on other grounds*, 743 F.3d 362 (2d Cir. 2014).

Section 455(b) operates differently, requiring "actual knowledge . . . regarding disqualifying circumstances and provid[ing] a bright line as to disqualification based on a known financial interest in a party." *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 127 (2d Cir. 2003). A "known financial interest

32

in a party, no matter how small, is a disqualifying conflict of interest and one that cannot even be waived by the parties." *Id.* at 128.

Although these provisions outline distinct statutory routes to disqualification, § 455(a) and § 455(b) have been considered in tandem under certain circumstances. For example, in *Chase Manhattan*, the district judge held a bench trial despite having a known investment in Chase Bank, which was ultimately awarded a significant portion of the verdict. *Id*. at 124, 130. On appeal, this Court held that the district judge abused his discretion by not recusing himself, because "an appearance of partiality requiring disqualification under Section 455(a) results when the circumstances are such that: (i) a reasonable person, knowing all the facts, would conclude that the judge had a disqualifying interest in a party under Section 455(b)(4)[;] and (ii) such a person would also conclude that the judge knew of that interest and yet heard the case." *Id.* at 128. In other words, "Section 455(a)

applies when a reasonable person would conclude that a judge was violating Section 455(b)[].” *Id.*

## C. Application

On the unique facts of this case, we conclude that the district judge abused his discretion by not reassigning the case pursuant to § 455(a).

First and foremost, the district judge had a close, near-paternal personal relationship with Kaplan, a participant in conduct that is sufficiently related to the criminal conduct with which Rechnitz is charged. The district judge had known, and been close with, Kaplan and his family since Kaplan's birth. In his decision denying the motion for recusal, the district judge explained that he had told Kaplan after his father died that “I would be available to him to discuss any problem he might have, as if I were his father.” App'x 264. That relationship was not only remarkably close; it was with a person who was directly involved in Rechnitz's bribery case. Kaplan

was mentioned in Rechnitz's testimony—both in the initial joint trial of Seabrook and Huberfeld and in the retrial of Seabrook before Judge Hellerstein—several times as one of the Platinum employees involved in securing the COBA investment. The government correctly points out that Kaplan was not one of the most central figures in Rechnitz's bribe scheme. But Rechnitz's testimony implicated Kaplan in concealing the Platinum investment from other COBA employees—a circumstance that placed Kaplan squarely in the middle of yet another incidence of wrongdoing at a firm where, through his guilty plea, he had already admitted to participating in a different criminal conspiracy. In sum, the district judge had a close personal relationship with Kaplan, who was directly implicated by Rechnitz in improprieties connected with the COBA investment, which in turn was an object of the bribery conspiracy with which Rechnitz was charged. That relationship alone, in light of these factual

circumstances, was sufficient to raise serious questions about the need for recusal.

But the facts here are even more complicated. The district judge did not merely have a close personal relationship with Kaplan; he *advised* Kaplan on his criminal case arising out of the Platinum collapse. As the district judge wrote in his order denying Rechnitz's motion for reassignment: "When Kaplan was indicted and was offered a plea in exchange for his cooperation, he came to me to help him think through his options." App'x 264. Thus, this is not merely a case where the district judge had a close relationship with a person involved in the underlying factual narrative of the case. Rather, the district judge here advised someone he regarded as a son on how to proceed with respect to his own criminal matter.

This close relationship, and the district judge's advisory role, is further problematic in light of the restitution question, because Kaplan and Rechnitz's interests are plausibly adverse on that issue.

COBA, of course, can recover its losses only once, even though two groups—those involved in the bribery scheme and those involved in the fraud—arguably caused them. *See United States v. Nucci*, 364 F.3d 419, 423–24 (2d Cir. 2004) (MVRA does not permit double recovery). It therefore remains uncertain *from whom* COBA will recover the $19 million it lost. Because Kaplan is a defendant in the Platinum case, it is possible that he will be ordered to pay restitution. There is thus a reasonable and apparent relationship between COBA's recovery from Rechnitz, Seabrook, and Huberfeld[8] (the defendants in the bribery case) and its possible recovery from the defendants in the Platinum case (including Kaplan): the more COBA recovers from the bribery defendants, the less it will need to recover from the Platinum defendants.[9] We conclude that this unusual combination of facts—

---

[8] As previously noted, Huberfeld's restitution in the bribery case could not extend to COBA's losses because he pleaded guilty only to charges involving wire fraud against Platinum, not to charges involving bribery and/or fraud against COBA. *Seabrook*, 968 F.3d at 231–36.

[9] Kaplan had not yet been sentenced as of June 2, 2023, the date of oral argument in this case. Of more relevance to our inquiry is the corollary fact that

namely the judge's close relationship with Kaplan, his advisory role in Kaplan's criminal case, and the proximity of the cases (including with respect to restitution)—would cause a reasonable person to question the district judge's impartiality and was sufficient to necessitate recusal under § 455(a).

We note that this potential overlap in restitution obligations between Kaplan and Rechnitz militates in favor of recusal by the district judge under § 455(a), even though § 455(b) is not technically violated. As stated above, a judge must recuse himself where "a person within a third degree of relationship" to the judge was "known by the judge to have an interest that could be substantially affected by the outcome of the proceeding." *See* 28 U.S.C. § 455(b)(5)(iii). To be sure, Kaplan does not possess the necessary degree of blood relationship to the district judge to give rise to a technical violation of 28 U.S.C. § 455(b)(5)(iii). *See* Code of Conduct

---

Kaplan had certainly not been sentenced at the time the district judge determined Rechnitz's restitution obligations.

for United States Judges, Canon 3(C)(3)(a) ("[T]he degree of relationship is calculated according to the civil law system; the following relatives are within the third degree of relationship: parent, child, grandparent, grandchild, great grandparent, great grandchild, sister, brother, aunt, uncle, niece, and nephew; the listed relatives include whole and half blood relatives and most step relatives . . . ."). But whether Kaplan was a sufficiently close blood relation to require recusal under § 455(b) is not the end of the story: the facts of this case show that Kaplan and the district judge regarded one another as having a relationship as close as such a blood relation. The district judge, recall, had told Kaplan that he would be available to him "as if [he] were his father." App'x 264. This was the functional equivalent of a relationship that creates the objective appearance of a § 455(b)

violation, and it therefore required recusal under § 455(a).[10] *See Chase Manhattan*, 343 F.3d at 128.

The distinction the district judge drew between Huberfeld and Rechnitz to justify his decision to recuse himself as to the former but not the latter is unpersuasive. The crux of the recusal inquiry as to Rechnitz is the appearance of impropriety created by the district court's relationship to a defendant in the Platinum case, the advisory role that the judge played in that defendant's proceedings, and the overlap between the Platinum matter (including, potentially, restitution issues) and the bribery cases before the district court. The mere fact that Rechnitz, unlike Huberfeld, was not also a defendant in the Platinum case does not render recusal unnecessary. Further,

---

[10] Any financial interest of Kaplan in the restitution of Rechnitz may be minimal. Platinum had upwards of a billion dollars under management, and COBA's losses, as a percentage of Platinum's total losses, may be quite small. That notwithstanding, even minor financial interests run afoul of § 455(b). *See Chase Manhattan*, 343 F.3d at 128 (holding that recusal was required under § 455(a) because a reasonable person could find a violation of § 455(b), despite the judgment for Chase Manhattan Bank being so small relative to the firm's size that it would not cause a "discernable" increase in the share values owned by the district judge, which were themselves not even 1% of the judge's personal assets).

we note our puzzlement over the district judge's decision to alert only Seabrook to the potential conflict arising out of his relationship with Kaplan. This selective disclosure undercuts the distinction drawn between Huberfeld and Rechnitz for recusal purposes—Seabrook, after all, was no more involved in Platinum's collapse than Rechnitz.

In any event, disclosure of the Kaplan relationship should have been made to Rechnitz. At least in these circumstances, it is not apparent why disclosure was appropriate for only one of three charged co-conspirators. That is not to say that in all cases recusal will necessarily be required for all co-defendants if it is required for one. However, this case presents an object lesson in the importance of early disclosure: significant time and resources could have been saved if the district judge had simultaneously given Huberfeld and Rechnitz the same disclosure regarding his relationship to Kaplan that he gave to Seabrook.

Having concluded that these considerations alone are sufficient to warrant reassignment, we pause to express our concerns about the district judge's post-sentencing communication with the United States Attorney's Office, conducted *ex parte* and off the record. We have previously emphasized that "the preferred way to proceed in criminal cases is under the assumption that nothing is 'off the record.'" *United States v. Amico*, 486 F.3d 764, 779 (2d Cir. 2007). True of course, but perhaps understated. A comprehensive record, particularly in a criminal case, is a paramount feature of fair proceedings. A full record not only protects the rights of the parties and enables future proceedings—including, of course, appeals that come before this Court—but also preserves and promotes transparency, a feature "pivotal to public perception of the judiciary's legitimacy and independence." *See United States v. Aref*, 533 F.3d 72, 83 (2d Cir. 2008). In the unusual circumstance where a court reporter is unavailable, a district court is well-advised to promptly place on

the record a full description of such communications. *See, e.g., United States v. Mejia*, 356 F.3d 470, 475 (2d Cir. 2004) ("[T]he proper practice for a jury inquiry and response thereto is as follows: (1) the jury inquiry should be in writing; (2) the note should be marked as the court's exhibit and *read into the record with counsel and defendant present*; (3) counsel should have an opportunity to suggest a response, and the judge should inform counsel of the response to be given; and (4) on the recall of the jury, *the trial judge should read the note into the record* . . . ." (citation omitted) (emphasis added)).

We recognize that courts are often confronted with information that may not be appropriate for public disclosure, such as grand jury materials, national security information, or cooperation in criminal investigations, to name a few. But the proper way to address any overriding interests in the confidentiality of such information—whether temporary or longer term—is not to keep it off the record. Instead, the court should ensure that the information is placed on the

record in some appropriate fashion and then carefully evaluate whether sealing or some other precautionary measure is warranted. *See United States v. Amodeo*, 44 F.3d 141, 147 (2d Cir. 1995) ("*Amodeo I*") ("While we think that it is proper for a district court, after weighing competing interests, to edit and redact a judicial document in order to allow access to appropriate portions of the document . . . [i]t seems to us that the district court should make its own redactions, supported by specific findings, after a careful review of all claims for and against access. Such findings would provide us with a basis for effective review in the event of a future appeal." (citations omitted)); *see also, e.g.*, *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) ("*Amodeo II*") ("One consideration [in limiting public access to judicial documents] is whether public access to the materials at issue is likely to impair in a material way the performance of Article III functions" by "adversely affect[ing] law enforcement interests or judicial performance. [For example,] [o]fficials with law enforcement

responsibilities may be heavily reliant upon the voluntary cooperation of persons who may want or need confidentiality."); *In re Grand Jury Subpoena*, 103 F.3d 234, 242 (2d Cir. 1996) ("Even if the presumption of openness attaches to th[e] qualified right [of access to criminal proceedings], however, it is overcome in the grand jury context by the overriding interest in secrecy."); Fed. R. Crim. P. 6(e)(6) ("Records, orders and subpoenas relating to grand jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury.").

*Ex parte* communications are similarly disfavored, particularly in the criminal context. "[A] judge should not initiate, permit, or consider *ex parte* communications" unless "authorized by law[,]" "when circumstances require it . . . for scheduling, administrative, or emergency purposes" (and even then, "only if the *ex parte* communication does not address substantive matters and the judge

45

reasonably believes that no party will gain a[n] . . . advantage as a result of the *ex parte* communication"), or "with the consent of the parties, [to] confer separately with the parties and their counsel in an effort to mediate or settle pending matters."  Code of Conduct for United States Judges, Canon 3(A)(4)(a)–(b), (d).  In other words, *ex parte* communications are the exception rather than the rule, and they require particular justification.  *See, e.g.*, *Aref*, 533 F.3d at 81 ("[*E*]*x parte*, *in camera* hearings in which government counsel participates to the exclusion of defense counsel are part of the process that the district court may use [under the Classified Information Procedure Act and Fed. R. Crim. P. 16] in order to decide the relevancy of [classified] information." (internal quotation marks omitted)); *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 386 (2d Cir. 2003) (submission of documents to court for *in camera*, *ex parte* review is "a practice both long-standing and routine in cases involving claims of privilege" (citations omitted)); *In re John Doe Corp.*,

675 F.2d 482, 490 (2d Cir. 1982) (*in camera*, *ex parte* submission is appropriate where it is the only way to resolve an issue without compromising the need to preserve the secrecy of the grand jury). The concerns created by unwarranted *ex parte* communications are particularly acute in criminal matters, subject, as they are, to heightened due process concerns. *See, e.g.*, *United States v. Napue*, 834 F.2d 1311, 1318–19 (7th Cir. 1987) ("*Ex parte* communications between the government and the court deprive the defendant of notice of the precise content of the communications and an opportunity to respond." (citing *In re Taylor*, 567 F.2d 1183, 1187–88 (2d Cir. 1977))).

The district judge's phone call with the prosecutor here was doubly ill-advised because it was both *ex parte and* off-the-record, magnifying the concerns inherent to both types of communications. After all, but for the commendable transparency of the United States Attorney's Office, Rechnitz would not have learned of this phone call. Further, there is no obvious justification for conducting this particular

inquiry *ex parte* and off-the-record. A public docket entry requiring

an update from the parties would have been equally effective to

monitor Rechnitz's restitution payments, as would have an internal

inquiry from the court to the Probation Office or to the Clerk of Court.

And to the extent that the district judge felt the need to emphasize his

views on Rechnitz's allegedly negative qualities, such statements

should be reserved for open, on-the-record forums, if shared at all.[11]

We underscore the unique set of facts presented by this case,

and accordingly the limited nature of our holding. "Remanding a

case to a different judge is a serious request rarely made and rarely

granted." *United States v. Singh*, 877 F.3d 107, 122 (2d Cir. 2017)

(internal quotation marks omitted). "Disqualification is not required

---

[11] To be sure, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555; *see also Wedd*, 993 F.3d at 115 ("Ordinarily, Section 455(a) will not require recusal based on a judge's comments during a proceeding that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases." (internal quotation marks omitted)).

on the basis of remote, contingent, indirect or speculative interests."

*Thompson*, 76 F.3d at 451 (internal quotation marks omitted). We are convinced that this record presents the rare case where failure to recuse amounted to an abuse of discretion. The district judge's relationship with Kaplan was not that of a mere acquaintance or even an ordinary friend. Rather, the judge made clear that he made himself available to Kaplan "as if [he] were his father." App'x 264. Nor is this a case where a close relation was involved in tangential facts, the details of which the district judge carefully avoided. On the contrary, Kaplan is a defendant in a nearby district for related criminal conduct with interests that are plausibly adverse to Rechnitz's with respect to restitution, and the district judge advised Kaplan on how to proceed with respect to his criminal exposure.

Finally, it bears note, this is not a case where a party sat on its hands despite knowing the basis for recusal, hoping for a favorable result, but intending to play the recusal card if sentencing did not go

his way. Rather, Rechnitz filed his motion for reassignment mere days after learning of the judge's relationship. Nor could reasonable diligence have alerted Rechnitz to the district judge's conflict earlier. The district judge disclosed the relationship to only one co-defendant (Seabrook), and even then, many of the relevant details, including the judge's advice to Kaplan, came to light only after Huberfeld's counsel happened to speak to certain witnesses and requested recusal. Moreover, Huberfeld's recusal request, along with its additional details, was inexplicably not placed on the public record, such that Rechnitz learned of it only after the government provided disclosure. The late factual revelations coupled with Rechnitz's diligent pursuit of reassignment allay any concerns of gamesmanship that might arise in other cases.

## III.  Conclusion

In sum, we hold as follows:

1. The district court abused its discretion in failing to recuse itself, because the court's close, advisory relationship with a criminal defendant in a related case, whose financial interests were plausibly adverse to Rechnitz's, would lead a reasonable observer to conclude that the district judge's impartiality could be questioned.

2. Given that holding, we need not reach Rechnitz's challenge to the merits of his restitution order.

We therefore REMAND with instructions that the case be reassigned to a different district judge for plenary resentencing.