# United States Court of Appeals
## For the First Circuit

No. 23-1768

UNITED STATES OF AMERICA,

Appellee,

v.

XAVIER O. MALDONADO-NEGRONI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Pedro A. Delgado-Hernández, U.S. District Judge]

Before

Barron, Chief Judge,
Lipez and Thompson, Circuit Judges.

Samuel P. Carrión, with whom Rachel Brill, Federal Public
Defender, Franco L. Pérez-Redondo, Assistant Federal Public
Defender, Supervisor, Appellate Unit, and Alejandra Bird-López,
Assistant Federal Public Defender, were on brief, for appellant.

Juan Carlos Reyes-Ramos, with whom W. Stephen Muldrow, U.S.
Attorney, Mariana E. Bauzá-Almonte, Assistant U.S. Attorney,
Chief, Appellate Division, and Julia M. Meconiates, Assistant U.S.
Attorney, were on brief, for appellee.

June 24, 2025

**LIPEZ**, **Circuit Judge**.  The district court determined erroneously that supervised-release violations committed by appellant Xavier O. Maldonado-Negroni ("Maldonado") fell within the most serious category of such transgressions.  On appeal, Maldonado claims that the statutory-maximum sentence he received on account of those violations must be vacated because -- among other reasons -- the record fails to show that the court's error in selecting the Guidelines range did not influence its sentencing determination.  We agree.  The district court's brief statement that it would have imposed the same term of imprisonment regardless of the violations' category, given in response to a question from the government after the court had explained and announced the sentence, is inadequate to satisfy the government's burden to show harmless error.  We thus remand the case for resentencing.

## I.

The revocation of supervised release that underlies this appeal was the third such revocation faced by Maldonado for his repeated violations of the conditions of release imposed after his 2013 conviction for drug trafficking.  We describe the prior two episodes before recounting the circumstances of the third set of violations and the challenged sentencing proceedings that followed.

## A. The First and Second Revocations

After pleading guilty in late 2013 to possession with intent to distribute cocaine near a protected location, Maldonado was sentenced to the statutory minimum of five years' imprisonment, followed by an eight-year term of supervised release. In July 2019, early in his original supervised-release term, Maldonado's probation officer saw him in possession of a two-way radio and in the company of an individual who was a "spotter" for a drug point at the Jardines de Sellés public housing project.[1] Although the probation officer reported that Maldonado had ultimately "admitted having the [two-]way radio in furtherance of the drug traffic operation at the [public housing project]," Maldonado was not charged with new criminal activity. Rather, based only on "Grade C" technical violations of his supervised release conditions[2] -- most notably, his "associati[on] with persons

---

[1] We draw the facts of Maldonado-Negroni's supervised-release violations primarily from the revocation motions submitted by his probation officer to the district court.

[2] The United States Sentencing Guidelines establish three grades of supervised-release violations, each carrying different advisory sentencing ranges. See U.S.S.G. §§ 7B1.1, 7B1.4; United States v. Menéndez-Montalvo, 88 F.4th 326, 329 (1st Cir. 2023). The least serious category, Grade C, covers "conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment of one year or less; or (B) a violation of any other condition of supervision." U.S.S.G. § 7B1.1(a)(3). Grade B applies to any "federal, state, or local offense punishable by a term of imprisonment exceeding one year." Id. § 7B1.1(a)(2). Grade A covers some specified crimes, including, as relevant here,

- 3 -

engaged in criminal activity" -- the district court revoked his supervised release and, in February 2020, imposed an eight-month term of imprisonment and a new eight-year term of supervised release.

Under the new terms of release, Maldonado was required to wear an electronic monitoring device for six months, abide by a curfew, and obtain permission from his probation officer before visiting the Jardines de Sellés housing project. Just days after his release from prison, however -- and the same day he met with his probation officer to set up the electronic monitoring device -- the probation officer went to Maldonado's home in response to an alert from the device and discovered its strap had been cut. There was no sign of Maldonado. His father told the probation officer he did not know his son's whereabouts.

Roughly five weeks later, in June 2020, Maldonado was arrested at the Jardines de Sellés housing project by members of the Drug Metro Unit of the Puerto Rico Police Department. He had in his possession substantial quantities of drugs. Again, however, the record shows no charges by federal authorities for the new criminal activity; nor does it contain information on any Commonwealth proceedings that followed his arrest. Although a controlled-substance offense would be a Grade A violation of

---

"crime[s] of violence," as well as "offense[s] punishable by a term of imprisonment exceeding twenty years." Id. § 7B1.1(a)(1).

- 4 -

supervised release, see U.S.S.G. § 7B1.1(a)(1), Maldonado and the government agreed that his supervised-release violations[3] would be classified as Grade B -- i.e., the middle of the scale between Grade A, the most serious category, and Grade C, see id. § 7B1.1 -- and they jointly recommended a term of ten months' imprisonment.[4]  The district court followed the recommendation, imposing the ten-month sentence and another eight-year period of supervised release.

## B. The Third Revocation: Pre-Sentencing Background

In November 2022, roughly eighteen months after completing his latest term of imprisonment, Maldonado was again reported for failing to comply with the conditions of his supervised release.  His probation officer initially informed the court that Maldonado had twice tested positive for drugs and, more significantly, he had been charged under Commonwealth law with

---

[3] The probation office initially notified the district court that Maldonado-Negroni had violated his conditions of supervised release by tampering with the monitoring device, disregarding his location restrictions, and generally failing to abide by his probation officer's instructions.  In a supplemental motion, the probation office alerted the court to additional violations related to his arrest: committing new criminal activity, unlawfully possessing drugs, and visiting the Jardines de Sellés housing project without prior authorization.  The district court's judgment revoking supervised release referenced only the original violations.

[4] Ten months was the high end of the applicable guideline for a Grade B violation based on Maldonado's criminal history category.

- 5 -

domestic violence and had not complied with the requirement that he report the incident and the involvement of local law enforcement to the probation officer.[5] As described in the government's later-filed pre-sentencing Revocation Memorandum, Maldonado had punched the victim, his former consensual partner, in the face and head and also grabbed her by the hair. The attack occurred in the presence of the victim's two-year-old daughter, an aggravating factor under Commonwealth law. Maldonado pleaded guilty to the domestic violence charges before the revocation proceedings at issue in this case and received a six-year sentence.

Maldonado did not contest the supervised-release violations in the November 2022 report and, in the memorandum he submitted in advance of his revocation hearing, he requested a twelve-month term of imprisonment. He acknowledged responsibility for his "ugly and reprehensible act," asserted that he was adequately punished for that conduct by the six-year Commonwealth sentence, and urged the court to punish him only for the breach of trust in violating his conditions of release and not for the

---

[5] The motion filed by the probation officer cited five conditions of supervised release that he asserted Maldonado had violated: (1) a prohibition against committing "another federal, state or local crime"; (2) a prohibition against unlawful possession of a controlled substance; (3) a requirement to "refrain from any unlawful use of a controlled substance"; (4) a requirement that, if "arrested or questioned by a law enforcement officer, [he] must notify the Probation officer within 72 hours"; and (5) a requirement to "follow the instructions of the Probation Office related to the conditions of supervision."

severity of the domestic violence crimes. In its memorandum, the government asked for a thirty-six-month sentence, the statutory maximum, "regardless of the advisory Guidelines range," and recommended that "[t]his imprisonment sentence . . . be set to run consecutively to [Maldonado's] undischarged term of imprisonment in [Commonwealth] court." The government noted that the "new violations are very serious and constitute a significant breach of the [c]ourt's trust." Its memorandum incorporated photographs of the domestic violence victim showing her severe injuries, which required medical treatment.

At the revocation hearing, the parties spent considerable time debating the proper classification of Maldonado's domestic violence criminal activity -- i.e., whether it should be treated as a Grade A or Grade B violation of supervised release. The government maintained that the Commonwealth statute of conviction set forth a "crime of violence" under the Guidelines and, hence, Maldonado's conduct constituted a Grade A violation with an associated sentencing range of twelve to eighteen months. See United States v. Menéndez-Montalvo, 88 F.4th 326, 329 (1st Cir. 2023) (explaining, in similar circumstances, that "the key distinction between a Grade A violation and a Grade B violation is whether the underlying conviction constitutes a 'crime of violence'"). The government added, however, that even if Maldonado was not convicted of a "crime of violence" as defined by the

- 7 -

Guidelines, the statutory maximum was appropriate based on the violent nature of his actual conduct, as well as his repeated supervised-release violations and their escalating "gravity." Maldonado insisted that the statute of conviction did not set forth a crime of violence, meaning that his actions constituted a Grade B violation carrying a sentencing range of four to ten months' imprisonment in his criminal history category. His attorney also noted the importance of the grade determination, emphasizing the "anchoring effect [of the Guidelines calculation] on th[e] [c]ourt's decision-making" and pointing out that "an erroneous calculation could infect the [c]ourt's ultimate sentencing determination."

Although stating that it understood defense counsel's argument concerning the Puerto Rico statute, the district court adhered to its determination in a prior, unrelated case that the provision was properly treated as a Guidelines "crime of violence." Thus faced with the longer sentencing range, defense counsel emphasized that Maldonado already had been punished for the criminal conduct itself with a "significant length of incarceration" -- a fact that "should temper the [c]ourt's sentence in this case." Counsel also cited "positive signs" in Maldonado's latest supervised-release period, including his employment and efforts to reestablish a relationship with his daughter, and highlighted Maldonado's regret and acceptance of responsibility.

Defense counsel's comments were followed by testimony from the victim, who reported that she had been unable to work regularly because of trauma from the attack and that she had lost some ability to perform the routine functions of daily life, including sleeping, eating, and caring for her children. The victim also indicated that she was seeing a psychiatrist, among other doctors, and continued to feel pain where she had been struck in the face. Maldonado then made a brief statement in which he apologized to the victim, stated that he accepted responsibility, noted the six-year sentence he had received on the domestic violence charges, and asked the court "to have some consideration with the time that you're going to give me."

The prosecutor spoke next, explaining why the government believed Maldonado's criminal record supported the maximum thirty-six-month sentence. The prosecutor pointed out that Maldonado had received the statutory minimum of five years' imprisonment and eight years of supervised release for his original "serious drug-trafficking offense," but he had failed to take advantage of the opportunities presented by those favorable penalties and instead "breached this [c]ourt's trust in a number of ways." The prosecutor went on to describe Maldonado's supervised-release violations, reporting that, the first time,

> the probation officer caught him with a
> two-way radio, a walkie-talkie, accompanied by

an individual who was, apparently, a spotter for a drug point.

And this is on the record, in the motion filed by the U.S. Probation Office, Docket Number 2004.  And this was at the Jardines de Sell[é]s Public Housing Project.

The defendant admitted that he possessed the radio in furtherance of the drug-trafficking operation at the public housing project.[6]  This was after having been convicted of participating in a large-scale drug-trafficking organization.

And he was revoked for not answering the U.S. Probation Officer's questions truthfully, for failing to work regularly at a lawful occupation and for associating with persons engaged in criminal activity.

The prosecutor then briefly reviewed the circumstances of the second set of supervised-release violations -- including Maldonado's tampering with his monitoring device and ultimate

---

[6] The probation officer's motion seeking Maldonado's arrest for violations of his supervised release conditions reported his admission as follows:

Mr. Maldonado-Negroni was directly asked if he was the subject that we had observed in possession of the [two]-way radio next to the electrical power box [at Jardines de Sellés Public Housing Project] and he admitted being the person with the [two]-way radio.  When we inquired as to the reasons for being in possession of the [two]-way radio, Mr. Maldonado-Negroni remained in silence and he was unable to provide a valid reason.  Later, Mr. Maldonado-Negroni admitted having the [two]-way radio in furtherance of the drug traffic operation at the [public housing project] . . ..

- 10 -

arrest by the Puerto Rico drug unit -- before highlighting the severity of the domestic violence attack that was the most serious of the recent violations. The prosecutor observed that, "after so many opportunities provided by this [c]ourt and the trust placed in him, the defendant paid back that trust by viciously beating his then consensual partner." The Commonwealth sentence, the prosecutor said, "does not account for the sentencing factors in this case, including the significant breach of this [c]ourt's trust and the heightened need to protect the victim and society from additional crimes by the defendant." In concluding his remarks, the prosecutor reiterated the government's position that thirty-six months of imprisonment was "the proper sentence, regardless of the applicable guideline range."

Defense counsel then responded to the government's argument, pointing out that the sentencing ranges for revocation of supervised release do not take acceptance of responsibility into account and "do not contemplate a lengthy state sentence for parallel criminal conduct." The attorney also noted that Maldonado's previous supervised-release violations were all for "technical violations," and he emphasized that the attack now at issue -- admittedly severe and "an escalation of conduct" -- was a "one-off" that is "not a pattern of conduct."

- 11 -

Following a brief colloquy in which the government sought to clarify a statement made by defense counsel,[7] the court said it would take a brief recess before returning to announce the sentence.

**C. The Imposition of a Sentence and the Immediate Aftermath**

The revocation hearing resumed roughly twenty minutes later. In explaining the sentence it was about to impose, the court began by affirming its finding that "the record reflects a Grade A violation." It then stated that, "[c]onsidering the totality of circumstances, a variant sentence is appropriate." The judge went on to explain why he was unpersuaded by "the defendant's well-thought arguments":

> The government summarized the problems that the defendant encounters in that regard. Among other things, this is not the first time that Mr. Maldonado has been brought before this [c]ourt for revocation proceedings. He has shown utter disregard for the supervision process and the conditions imposed, including, more recently, violations of Articles 3.2 and 3.3 of the Puerto Rico Domestic Abuse Prevention and Intervention Act.
>
> . . .
>
> Mr. Maldonado's conduct occurred in the presence of a minor. The victim described in open court her experience, her situation, and

---

[7] That discussion, not relevant here, concerned whether Maldonado had chosen to forgo testimony from the victim in proceedings relating to the attack in part to spare her from "the ordeal of a trial." The government pointed out that Maldonado had sought her testimony at the preliminary revocation hearing.

the pain and suffering she has endured and is going through.

Taking all aspects of the case into account, on the judgment of the [c]ourt, Mr. Xavier Maldonado is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 36 months, to run consecutive to the [Commonwealth] sentence . . ..

The court also imposed a new supervised release term of five years.

When the court completed its pronouncement, the government, "for the completeness of the record," immediately asked the court to clarify whether it "would have imposed the same sentence regardless of the guideline" -- specifically, "whether it's a Grade A violation or Grade B violation under the [G]uidelines." The court then said: "Yes. In response to your question, the answer is yes. That's the sentence I would have imposed."

Defense counsel then objected to the Grade A designation, as well as to the procedural and substantive reasonableness of the variant sentence. Counsel added: "We also plan to object as well to the government's representation that Mr. Maldonado had admitted criminal conduct related to the possession of a radio and some drug-trafficking offense, given that he was not found in violation of the supervised release for that offense." In response, the prosecutor told the court that defense counsel was misinterpreting the government's position and that "at no point

did [he] argue that defendant should be found more culpable based on something that . . . was not found in the previous revocations." The prosecutor elaborated as follows:

> I made reference to the motion at Docket Number 2004, and it states that he had a walkie-talkie. And that's it. . . . [A]nd he was revoked for not answering the U.S. Probation Officer's questions truthfully, not maintaining a regular, lawful occupation, and associating with persons engaged in criminal activity.
>
> And our arguments were focused on the fact that he was associating with persons engaged in criminal activity, as described in the probation officer's motion. Just to clarify the record on what was the government's argument.

The government's clarification was then "[n]oted" by the court and, after Maldonado's attorney stated that the "[d]efense objection stands," the court responded by saying, "My ruling stands."

## II.

### A. Background

As it turned out, the district court erred in finding that Maldonado's violations of the Puerto Rico Domestic Abuse Prevention and Intervention Act were "crimes of violence" under the Guidelines. After Maldonado's revocation hearing, we held in another case that Article 3.1 of the statute is not "a 'crime of violence' as that term is used in section 7B1.1(a)(1) of the United States Sentencing Guidelines." Menéndez-Montalvo, 88 F.4th at

- 14 -

328. Although Maldonado was convicted for violating different sections of the statute -- Articles 3.2 and 3.3 -- the government concedes that our reasoning in Menéndez-Montalvo governs Article 3.2, and it assumes for purposes of this appeal that Article 3.3 "is also not a crime of violence." Accordingly, contrary to the district court's determination, Maldonado committed a Grade B violation of his supervised release, not a Grade A violation, and the applicable sentencing range was therefore four to ten months rather than twelve to eighteen months.

Maldonado claims on appeal that the district court's error entitles him to resentencing even though the court stated that it would have imposed the same sentence regardless of the applicable guideline range. He maintains that the court's unelaborated affirmative response to the prosecutor's post-pronouncement question was inadequate to show that the error did not affect the court's choice of sentence. In addition, he contends that his sentencing may have been improperly influenced by the government's statement that he had admitted to possessing a walkie-talkie in furtherance of drug trafficking during his first period of supervised release, thereby suggesting, incorrectly, that his first revocation was premised on new criminal conduct.

We address the merits of only the claim based on the court's "crime of violence" error because that error on its own

requires a remand.[8]  With respect to Maldonado's challenge to the government's depiction of the violations that triggered his first revocation of supervised release, we note that Maldonado brought that issue to the district court's attention at the conclusion of the original sentencing proceeding, and he will have an additional opportunity on remand to clarify any misimpression.  We therefore do not further discuss that claim.[9]

---

[8] As recounted above, the record makes clear that Maldonado properly preserved his challenge to the district court's erroneous determination that he had committed a Grade A violation.  The government does not contend otherwise, asserting only that Maldonado's other claims were raised either belatedly or not at all.

[9] Maldonado also argues that the district court committed procedural and substantive errors on grounds that overlap with the harmless-error assessment for the Guidelines error, see infra, insofar as each inquiry involves the adequacy of the court's explanation for its chosen sentence.  First, he asserts that the court did not sufficiently explain its decision to impose the statutory maximum sentence, a type of procedural error. See United States v. Turner, 124 F.4th 69, 81 (1st Cir. 2024) (identifying "'fail[ure] to adequately explain the chosen sentence' as a type of procedural error" (alteration in original) (quoting United States v. Dávila-González, 595 F.3d 42, 47 (1st Cir. 2010))). Given that the district court on remand must reconsider Maldonado's sentence because of its Guidelines error and explain the sentence it chooses, we see no need to evaluate the separate claim of error based on the adequacy of its original explanation.  Second, Maldonado argues that the thirty-six-month sentence is substantively unreasonable, a claim of error that we likewise decline to consider at this juncture because it, too, turns in part on the adequacy of the district court's stated rationale. See, e.g., United States v. Centariczki, 98 F.4th 381, 385 (1st Cir. 2024) (referring to the "'plausible sentencing rationale' element of the test for substantive reasonableness" (quoting United States v. Soto-Soto, 855 F.3d 445, 450 (1st Cir. 2017))).

**B. The Impact of the Guidelines Error**

With the government acknowledging that the district court made an erroneous Guidelines determination, the question before us is whether the court's error requires resentencing of Maldonado. The answer depends on whether the error was prejudicial, see United States v. Tavares, 705 F.3d 4, 25-26 (1st Cir. 2013), an issue on which the government bears the burden of proof when -- as here -- the defendant made a timely objection, see Molina-Martinez v. United States, 578 U.S. 189, 202-03 (2016). Although a district court's application of "an incorrect, higher Guidelines range" ordinarily will be cause for resentencing, id. at 200, both the Supreme Court and our court have recognized that there are circumstances in which the sentencing court's application of an erroneous Guidelines range may be found harmless, see id. at 200-01; United States v. Ouellette, 985 F.3d 107, 110 (1st Cir. 2021), such as "when a sentencing court makes clear that it would have entered the same sentence regardless of the Guidelines," Ouellette, 985 F.3d at 110.

The government says this is such a case because the court's "yes" response when the prosecutor directly asked if the court "would have imposed the same sentence regardless of the guideline" -- particularly when that affirmation is considered in context -- makes clear that the error had no effect on Maldonado's sentence. Maldonado counters that the court's minimal response,

provided only upon inquiry after the court had already imposed a sentence, does not suffice.

As we shall explain, there is some force in the government's perspective, but not enough. When the sentencing judge errs in identifying the applicable Guidelines range, "[t]he record . . . must make the innocuous nature of the error unmistakable." United States v. Romero-Galindez, 782 F.3d 63, 70 (1st Cir. 2015). Requiring the absence of prejudice to be "unmistakable" follows inescapably from the high stakes involved in sentencing decisions and the anchoring role of the Guidelines in that decision-making. See Molina-Martinez, 578 U.S. at 199-200 (noting that, "[i]n the usual case, . . . the systemic function of the selected Guidelines range will affect the sentence"). The law is "clear that the Guidelines are to be the sentencing court's 'starting point and . . . initial benchmark.'" Id. at 198 (omission in original) (quoting Gall v. United States, 552 U.S. 38, 49 (2007)); see also Tavares, 705 F.3d at 25 (stating that "[t]he district court is required to calculate the defendant's guidelines sentencing range before exercising its discretion"). Given that "central role," Molina-Martinez, 578 U.S. at 199, "where the starting point is wrong" because of a Guidelines error, the defendant even under plain-error review ordinarily will be able to "show[] a 'reasonable probability of a different outcome,'" United States v. Taylor, 848 F.3d 476, 498 (1st Cir. 2017) (quoting

- 18 -

Molina-Martinez, 578 U.S. at 200).  Although the government can rebut that probability, it must identify "a clear statement by the [sentencing] court that would be sufficient to diminish the potential of the [Guideline Sentencing Range] to influence the sentence actually imposed."  United States v. Hudson, 823 F.3d 11, 19 (1st Cir. 2016) (alterations in original) (quoting United States v. Marchena-Silvestre, 802 F.3d 196, 201 (1st Cir. 2015)).

The record before us lacks the requisite clarity to satisfy this exacting harmless-error standard.  Importantly, as revealed in our description of the revocation hearing, the parties and the court discussed at some length the proper grade for Maldonado's violation before the court ruled incorrectly that Grade A applied.  Then, when the court returned after a brief recess to make its formal sentencing pronouncement, it began by reiterating its earlier Grade A determination.  Starting with that determination was, of course, both appropriate and required.  The grade determined the applicable Guidelines range -- the first step in every sentencing.  But when the court went on to discuss its reasons for accepting the government's recommendation of the statutory-maximum term of imprisonment, it never said it chose that sentence without regard to the Guidelines range.

The court did say that it found "a variant sentence . . . appropriate" when "[c]onsidering the totality of circumstances," and it stated that the thirty-six-month sentence resulted from

- 19 -

"[t]aking all aspects of the case into account." These general statements, however, markedly differ from those in cases where we have found a Guidelines error harmless because the courts had expressed their specific intent to "untether" their sentencing judgments from the Guidelines.

In Ouellette, for example, the district court stated: "[T]he sentence I have announced today is untethered from the [G]uidelines. I would impose precisely the same sentence even if the applicable sentencing guideline range would have been reduced by any or all of the objections made for the reasons that I have articulated in some detail." 985 F.3d at 109. The district court in United States v. Ahmed, 51 F.4th 12 (1st Cir. 2022), used strikingly similar language:

> I want it to be clear that even if I had accepted any of the objections or arguments that I have rejected, the sentence I have announced today would be the same untethered from the [G]uidelines. That is, based on the [18 U.S.C. §] 3553(a) sentencing factors, I would impose the same sentence, even if the [applicable Guidelines range] had been reduced by my acceptance of an argument that I have not accepted.

Id. at 21 (first alteration in original).[10] And in Tavares, where the district court's Guidelines error was its "failure to calculate

---

[10] The statute that governs sentencing for a violation of supervised release, 18 U.S.C. § 3583(e), directs the district court to consider certain factors set forth in 18 U.S.C. § 3553(a). Those factors include "the nature and circumstances of the offense

- 20 -

definitively the operative [G]uidelines sentencing range," 705 F.3d at 25, the court, in explaining its decision to impose an upward variant sentence, expressly distanced itself from the two different ranges urged by the parties: "[E]ssentially I will sentence in a way that it will make [the guideline sentencing range calculation] not matter."  Id. (alterations in original).  The court thus made clear that the sentence it was imposing would be the same "regardless of whether Mr. Tavares's [G]uidelines sentencing range was that calculated by the [g]overnment or by Mr. Tavares."  Id.; see also, e.g., United States v. Acevedo-Hernández,

_____

and the history and characteristics of the defendant."  Id. § 3553(a)(1).

898 F.3d 150, 172 (1st Cir. 2018);[11] <u>Romero-Galindez</u>, 782 F.3d at 70-71.[12]

By contrast, in <u>Taylor</u>, we concluded that a Guidelines error was <u>not</u> harmless in circumstances similar to those here: the prosecutor asked the trial court judge, "[b]efore the sentencing wrapped up" -- i.e., after the pronouncement of sentence but before the proceeding ended -- whether she would have imposed the same sentence even if she had not found the defendant to be a career

---

[11] In <u>Acevedo-Hernández</u>, we concluded that "any of the alleged errors" in calculating the defendant's Guidelines range would have been harmless based on the following statement from the court:

> I would like to make clear that regardless of the application of the [G]uidelines, regardless of whether any other of those adjustments would have been proper, this [c]ourt would have, considering such a determination, that the [G]uidelines would not properly reflect the seriousness of the offense and the participation of this defendant and the [c]ourt would have engaged in a variance under the 3553 factors and would have imposed the same sentence that I am imposing here today.

898 F.3d at 172.

[12] In <u>Romero-Galindez</u>, we declined to evaluate the defendant's claim that his presentence investigation report incorrectly calculated his criminal history category -- and thus triggered the wrong Guidelines range -- because the district court's explanation for the sentence it imposed "unambiguously" showed that any such error would have been harmless. 782 F.3d at 70-71. The trial judge had stated explicitly "that he was not going to sentence [the defendant] according to the Guidelines" and thus "made it apparent that [the defendant's] criminal history category did not affect the ultimate sentence imposed." <u>Id.</u> at 70.

- 22 -

offender under the Guidelines -- the finding that proved to be erroneous. 848 F.3d at 497. The judge "agreed that she would." Id. We rejected the government's argument that this agreement "was clear enough to show the erroneously calculated Guidelines range did not influence the sentence ultimately imposed." Id. at 498.

To be sure, the error in Taylor had a more complex impact on the Guidelines calculation than the error at issue here. There, the defendant's presentence investigation report incorrectly classified a prior conviction for larceny as a crime of violence, and that error affected both his offense level, by triggering career-offender status, and his criminal history score. See id. at 498-99. The district court varied downward from the Guidelines range associated with career-offender status, explaining that it used a lower offense level to determine the sentence -- a choice that partially negated the impact of its Guidelines error.[13] The issue of prejudice remained, however, because the court's "statement of reasons d[id] not explain away the potential impact of the inflated criminal history score." Id. at 499. Because it used the incorrect criminal history score, the court still "started

---

[13] The range for defendant Taylor as a career offender was 360 months to life in prison. The correct, non-career offender range was 235 to 293 months. See Taylor, 848 F.3d at 496-97. The district court ruled that the higher range applied, but it sentenced Taylor to a variant term of 235 months. See id. at 497.

from the wrong starting point," id., making it "reasonable to assume" that the sentence was longer than it would have been without the error, id. at 498.

Given the ambiguity concerning the impact of the erroneous criminal history score, we held in Taylor that, even under plain-error review, the court's bare affirmative response to the government's post-pronouncement inquiry was inadequate to "show that the Guidelines were irrelevant, or that the trial court judge intended to untether [the defendant's] sentence from the Guidelines range." Id. at 499. We thus concluded that the defendant had "shown that the improperly calculated Guidelines range was prejudicial." Id.

The government argues that here, unlike in Taylor, the "untethering" is clear from context, even absent language from the court as explicit as in the cases, described above, where we have found Guidelines errors harmless. The government emphasizes that it repeatedly argued, both in its revocation memorandum and at the hearing, that the Grade A versus Grade B judgment made no difference in its request for the statutory-maximum sentence. The government further points out that the extended colloquy on the correct category for the supervised-release violations -- and, hence, the correct Guidelines range -- does not mean that the Guidelines range affected the sentence because, as we have noted, the district court was obligated to make that determination at the

outset of its sentencing deliberations. More telling, according to the government, was the court's citing Maldonado's repeated supervised-release violations and the severity of his domestic-violence crime in its explanation for the sentence -- the reasons cited by the government to justify the maximum sentence, irrespective of the applicable Guidelines range.

We disagree that this context confirms that the Guidelines range was irrelevant to the court's sentencing choice. Despite the government's repeated insistence to the court that the grade of Maldonado's violation, and thus the applicable guideline, did not matter, the court never stated during its colloquy with the parties prior to its pronouncement of the sentence that it accepted that view. Rather, after the prosecutor at one point argued that "the guideline issues should be immaterial in this particular case," the court responded only with the ambiguous comment, "I understand."

Nor does the explanation given by the court when it announced its chosen sentence eliminate the ambiguity. As noted above, the court said nothing during its sentencing pronouncement to indicate that the Guidelines did not "anchor" its exercise of discretion. Molina-Martinez, 578 U.S. at 198 (quoting Peugh v. United States, 569 U.S. 530, 549 (2013)). Indeed, the court's unqualified statement that the thirty-six-month term of imprisonment took "all aspects of the case into account" suggests

to the contrary. Because "the correct Guidelines range" is one aspect of the case the court is obliged to consider in selecting a sentence, Rosales-Mireles v. United States, 585 U.S. 129, 144 (2018), the district court's statement does not dispel the likelihood that it took the incorrect range into account. The court's brief "yes" response when the government sought, post-sentencing, to demonstrate the irrelevance of the Grade A guideline was an afterthought, given only upon prompting and without elaboration, and it therefore does not provide adequate assurance that the district court intended to "untether" its sentence from the Guidelines.

Significantly, unlike in Tavares, where the sentencing judge also varied upward from both ranges urged by the parties, see 705 F.3d at 24-25, the district court here never explained why possibly "start[ing] from the wrong starting point" would be inconsequential, Taylor, 848 F.3d at 499. Yet, the magnitude of the court's variation from the recommended Guidelines sentence is dramatically different when applying the two guideline ranges. With the correct guideline in mind -- four to ten months -- the thirty-six-month sentence that Maldonado received is nearing four times the top of the sentencing range. With the incorrect guideline range in mind -- twelve to eighteen months -- the

sentence imposed is only twice the top of the range.[14]  There is no indication that the district court recognized that difference when it imposed the sentence, and its summary response to the government's post-pronouncement question about whether the choice of guideline mattered sheds no light on whether the court intentionally disregarded the more substantial disparity between its chosen sentence and the alternative, correct Guidelines range urged by Maldonado.  Put differently, the court never explained why thirty-six months was the proper sentence even though that sentence would be well more than triple the top of the Grade B guideline range but only double the top of the Grade A range.

We are not suggesting that a district court must use specific terminology to make clear that its sentence is "untethered" from the Guidelines.  Rather, we hold that the district court's unelaborated response was insufficient to show that the sentence imposed was detached from the erroneous Guidelines range.[15]  Other circuits have adopted the same view. See, e.g., United States v. Asbury, 27 F.4th 576, 581 (7th Cir.

---

[14] The contrast also can be illustrated by considering the bottom of each range.  The thirty-six-month sentence imposed on Maldonado is three times the twelve-month bottom of the higher guideline range.  Three times the bottom of the lower, correct range of four to ten months is twelve months -- the variant sentence that Maldonado requested.

[15] We do not address what sort of explanation would be adequate to make that showing.

2022) ("'[A] conclusory comment tossed in for good measure' is not enough to make a [G]uidelines error harmless." (quoting United States v. Abbas, 560 F.3d 660, 667 (7th Cir. 2009))); United States v. Williams, 5 F.4th 973, 978 (9th Cir. 2021) (vacating and remanding in light of Guidelines miscalculation notwithstanding the district court's assertion "that it would have imposed the same sentence" regardless of the grade of defendant's supervised-release violation); United States v. Seabrook, 968 F.3d 224, 234 (2d Cir. 2020) (remanding for resentencing based on a Guidelines error despite district court's assertion that it would have imposed the same sentence under the correct Guidelines range because, inter alia, "we cannot be certain that the court's calculus would not have been altered had it appreciated the full extent of the upward variance it was contemplating").

In sum, our precedent requires more assurance than can be drawn from this record that Maldonado's sentence was unaffected by the erroneous finding of a Grade A supervised-release violation, the most serious level. Because the district court did not provide an explanation for its sentencing choice that shows "unmistakabl[y]" that its Guidelines error was harmless, Romero-Galindez, 782 F.3d at 70, we vacate the sentence imposed and remand for resentencing.

So ordered.